[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 00-15981

_____

D. C. Docket No. 00-9009

NED L. SIEGEL,
GEORGETTE SOSA DOUGLAS, et al.,

Plaintiffs-Appellants,

versus

THERESA LEPORE,
CHARLES E. BURTON, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(December 6, 2000)**

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

This is an appeal from the denial of a preliminary injunction.

The Republican candidates for the offices of President and Vice President of the United States, along with several registered Florida voters, filed suit in federal court in Miami, seeking to enjoin four Florida counties from conducting manual recounts of ballots cast for President of the United States in the November 7, 2000, election. The district court denied Plaintiffs' request for preliminary injunctive relief, and Plaintiffs appeal. For the reasons stated below, we affirm.

I.

On November 7, 2000, Florida voters cast ballots for several offices, including votes for the twenty-five electors for President and Vice-President of the United States. The following day, the Division of Elections for the State of Florida reported that the Republican Party presidential ticket received 2,909,135 votes, and the Democratic Party presidential ticket received 2,907,351 votes, for a margin of difference of 1,784, or 0.0299% of the total Florida vote.

Under Florida law, county canvassing boards are responsible for determining the number of votes cast for each candidate. See Fla. Stat. § 102.141. If a candidate for office is defeated by one-half of one percent or less of the votes cast for such office, the canvassing board must order a recount. See id. § 102.141(4). Pursuant to this statute, because the Presidential vote returns reflected that the Democratic ticket was defeated by less than one-half of one percent, the

canvassing boards conducted automatic recounts of the votes. After the automatic recounts, the Republican ticket retained the majority of votes, although by a slimmer margin.

Under Florida law, a manual recount may be requested by any candidate whose name appeared on the ballot, a political committee that supports or opposes an issue that appeared on the ballot, or a political party whose candidates' names appeared on the ballot. See Fla. Stat. § 102.166(4)(a). Such a request must be filed with the canvassing board within 72 hours after midnight of the date the election was held, or before the canvassing board has certified the challenged results, whichever is later. See id. § 102.166(4)(b). The canvassing board may, but is not required to, grant the request. See id. § 102.166(4)(c); Broward County Canvassing Bd. v. Hogan, 607 So. 2d 508, 510 (Fla. Dist. Ct. App. 1992) ("The statute clearly leaves the decision whether or not to hold a manual recount of the votes as a matter to be decided within the discretion of the canvassing board."). The statutory manual recount provision applies to all Florida counties. Therefore, the procedure for requesting a manual recount is the same in all counties, although the decision of whether to conduct a manual recount would, of course, be made separately by each county's canvassing board.

Once authorized by a county canvassing board, a manual recount must include "at least three precincts and at least 1 percent of the total votes cast for such candidate." Id. § 102.166(4)(d). The person requesting the recount chooses three precincts to be recounted, and, if other precincts are recounted, the canvassing board chooses the additional precincts. See id. If the results of the manual recount indicate "an error in the vote tabulation which could affect the outcome of the election, the county canvassing board shall: (a) Correct the error and recount the remaining precincts with the vote tabulation system; (b) Request the Department of State to verify the tabulation software; or (c) Manually recount all ballots." Id. § 102.166(5).

Florida law specifies the procedures for a manual recount. Section 102.166(7) of the Florida Statutes provides that:

(a)     The county canvassing board shall appoint as many counting teams of at least two electors as is necessary to manually recount the ballots. A counting team must have, when possible, members of at least two political parties. A candidate involved in the race shall not be a member of the counting team.

(b)     If a counting team is unable to determine a voter's intent in casting a ballot, the ballot shall be presented to the county canvassing board for it to determine the voter's intent.

In this case, the Florida Democratic Party filed requests for manual recounts in Broward, Miami-Dade, Palm Beach, and Volusia Counties on November 9,

4

2000, within the 72-hour statutory deadline. The stated reasons for the requests included the closeness of the statewide race and a concern that the vote totals might not reflect the true will of Florida voters. The apparent practical effect of a manual recount is that some ballots which were unreadable by machine due, for example, to voters' failure to mark or punch the ballots in a machine-legible fashion, might be read by human counters; and these votes could be added to the totals for each candidate.

## II.

On November 11, 2000, registered voters Ned L. Siegel from Palm Beach County, Georgette Sosa Douglas from Broward County, Gonzalo Dorta from Miami-Dade County, Carretta King Butler from Volusia County, Dalton Bray from Clay County, James S. Higgins from Martin County, and Roger D. Coverly from Seminole County, along with the Republican candidates for President and Vice-President, George W. Bush and Richard Cheney (collectively "Plaintiffs"), filed a Complaint and a Motion for a Temporary Restraining Order and Preliminary Injunction in the district court for the Southern District of Florida. Plaintiffs sued members of the county canvassing boards of Volusia, Palm Beach, Broward, and

Miami-Dade Counties.[1]  Plaintiffs' Complaint alleged that the manual recounts

violate the Fourteenth Amendment's guarantees of due process and equal

protection, and deny and burden the First Amendment's protection of votes and

political speech.

Plaintiffs' prayer for relief in their Complaint included the following:

> (a) Declaring that Defendants may not subject any vote totals to manual recounts;

> (b) In the alternative, declaring that Florida Statute § 102.166(4) is unconstitutional to the extent it does not limit the discretion of Defendants to conduct manual recounts in this case;

> (c) Declaring that Defendants should certify and release forthwith all vote totals that have been the subject of two vote counts since November 7, 2000;

> (d) Declaring that the form of ballot used in Palm Beach County was valid;

> (e) Declaring that any ballot punched or marked for two Presidential candidates not previously counted cannot now be counted;

> (f) Consolidating or removing to this Court any and all actions filed across the State of Florida purporting to challenge the results of the November 7 statewide election or otherwise delay the certification and release of those results; and

---

[1]      There are no state defendants in this case.  In addition to the parties mentioned above, the district court granted a motion by the Florida Democratic Party to intervene, and the Florida Democratic Party is an intervenor-appellee in this case on appeal.  The Attorney General also appeared as an amicus at oral argument to defend the constitutionality of the statute.

(g) Granting such other and further relief as this Court shall deem just and proper.

(Complaint at 16-17.)

The Motion for a Temporary Restraining Order and Preliminary Injunction which Plaintiffs filed with their Complaint asked, inter alia, that the district court prohibit the county canvassing boards from proceeding with manual recounts of the November 7th election results. Like the Complaint, this motion contended that the manual recounts violate the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

The district court heard oral argument on the motion on November 13, 2000, and Plaintiffs' request for a preliminary injunction was denied. On November 14, 2000, Plaintiffs filed a notice of appeal.[2]

During the pendency of this appeal, several Florida cases were appealed to the Florida Supreme Court. In these cases, some plaintiffs challenged Florida Secretary of State Katherine Harris's decision to refuse to accept the results of manual recounts submitted by county canvassing boards after the statutory deadline of 5:00 p.m. on November 14, 2000. On November 21, 2000, in the

_____

[2] The documents in this case were lodged in this Court as they were filed in the district court. Pursuant to Federal Rule of Appellate Procedure 35, this Court ordered that this case be heard initially en banc. See Hunter v. United States, 101 F.3d 1565, 1568 (11th Cir. 1996) (en banc); Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc).

consolidated cases of <u>Palm Beach County Canvassing Bd. v. Harris</u>, <u>Volusia County Canvassing Bd. v. Harris</u>, and <u>Florida Democratic Party v. Harris</u>, the Supreme Court of Florida decided that Florida Secretary of State Harris must accept the late-reported results of manual recounts from these counties submitted by the evening of November 26, 2000.  The Florida Supreme Court expressly stated that neither party had raised as an issue on appeal the constitutionality of Florida's election laws, and it did not address federal constitutional issues in its opinion.[3]

On appeal, Plaintiffs filed an Emergency Motion for an Injunction Pending Appeal, asking this Court to prohibit the county canvassing board Defendants from proceeding with manual ballot recounts.  This motion was denied without prejudice on November 17, 2000.  Among other things, we then said:

> Both the Constitution of the United States and 3 U.S.C. § 5 indicate that states have the primary authority to determine the manner of appointing Presidential Electors and to resolve most controversies concerning the appointment of Electors.  The case law is to the same effect, although, of course, federal courts may act to preserve and decide claims of violations of the Constitution of the United States in certain circumstances, especially where a state remedy is inadequate. In this case, the State of Florida has enacted

---

[3]     The United States Supreme Court recently vacated the Florida Supreme Court's opinion.  <u>See</u> <u>Bush v. Palm Beach Canv. Bd.</u>, No. 00-836 (U.S. Dec. 4, 2000).

detailed election dispute procedures. These procedures have been invoked, and are in the process of being implemented, both in the form of administrative actions by state officials and in the form of actions in state courts, including the Supreme Court of Florida. It has been represented to us that the state courts will address and resolve any necessary federal constitutional issues presented to them, including the issues raised by Plaintiffs in this case. If so, then state procedures are not in any way inadequate to preserve for ultimate review in the United States Supreme Court any federal questions arising out of such orders.

Order Denying Plaintiffs' Emergency Motion for Injunction Pending Appeal, Touchston v. McDermott, No. 00-15985 (Nov. 17, 2000) (citations omitted).

Plaintiffs moved this Court to expedite the underlying appeal, which motion we granted. This case is now before us on the appeal of the district court's denial of Plaintiffs' motion for a preliminary injunction. Plaintiffs ask this Court either to reverse the district court's decision, enjoin the canvassing board Defendants from conducting manual recounts or certifying election results that include manual recounts, or order the deletion and/or non-inclusion of final vote tabulations that reflect the results of manual recounts.[4]

---

[4] Plaintiffs' request on appeal is thus broader than their request for an injunction pending appeal, which asked only that we halt manual recounts then underway. To the extent that Plaintiffs' request on appeal represents a petition for permanent relief, we must decline to convert this appeal of a denial of a preliminary injunction into a final hearing on the merits of Plaintiffs' claims. Our review of such a case is normally limited to whether the district court abused its discretion; however, we recognize that an appellate court under some circumstances may decide the merits of a case in connection with its review of a denial of a preliminary

This Court has carefully considered Plaintiffs' appeal, as well as the other documents filed, and has conferred <u>en banc</u> on numerous occasions. We heard oral

---

injunction. <u>See</u> <u>Thornburgh v. American College of Obstetricians & Gynecologists</u>, 476 U.S. 747, 755-56, 106 S. Ct. 2169, 2176 (1986).

In <u>Thornburgh</u>, the Supreme Court said that "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction." <u>Id.</u> at 757, 106 S. Ct. at 2177. The Supreme Court affirmed the appellate court's decision to review the merits, rather than merely determine whether the district court had abused its discretion by entering a preliminary injunction, where it had the benefit of "'an unusually complete factual and legal presentation from which to address the important constitutional issues at stake.'" <u>Id.</u> (quoting <u>Thornburgh v. American College of Obstetricians & Gynecologists</u>, 737 F.2d 283, 290 (3d Cir. 1984)). Additionally, the Supreme Court observed that appellate review was aided by three recent decisions from the same circuit on the constitutional issues. <u>See</u> <u>id.</u> at 753-54, 757, 106 S. Ct. at 2174-75, 2177. Thus, it stated that "when the unconstitutionality of the particular state action under challenge is clear," an appellate court need not abstain from addressing the merits. <u>Id.</u> at 756, 106 S. Ct. at 2176. In so holding, however, the Supreme Court noted that "[a] different situation is presented, of course, when there is no disagreement as to the law, but the probability of success on the merits depends on facts that are likely to emerge at trial." <u>Id.</u> at 757 n.8, 106 S. Ct. at 2177 n.8 (citations omitted).

This case clearly falls within this latter category, and thus represents the very situation in which the Supreme Court held that appellate review was not appropriate. The answer to the constitutional questions is anything but clear. And, in stark contrast to <u>Thornburgh</u>, we have before us a factual record that is largely incomplete and vigorously disputed. The district court based its ruling on Plaintiffs' motion for a preliminary injunction solely on limited affidavits and the submission of few documents, including news media reports. Moreover, there was no discovery in this case, much less a trial or a plenary hearing, and none of the scant evidence presented to the district court was tested by the adversarial process of cross-examination. The controlling relevant facts are fervently contested by the parties. These evidentiary infirmities are especially problematic given that Plaintiffs' major claims are as-applied challenges to the Florida statutes, arguments the validity of which depends upon the development of a complete evidentiary record. Mere expediency does not warrant this Court reaching the merits of Plaintiffs' claims in the absence of the necessary evidence by which to do so. Therefore, applying the reasoning of <u>Thornburgh</u>, the circumstances of this case as it currently stands require us to deny their request.

10

argument on December 5, 2000. Recognizing the importance of a resolution to this case, a prompt decision on the appeal is required.

III.

We first consider whether Rooker-Feldman bars our exercise of subject matter jurisdiction over Plaintiffs' claims.

The Rooker-Feldman doctrine provides that federal courts, other than the United States Supreme Court, have no authority to review the final judgments of state courts. See District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S. Ct. 1303, 1317 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16, 44 S. Ct. 149, 150 (1923). The doctrine extends not only to constitutional claims presented or adjudicated by a state court, but also to claims that are "inextricably intertwined" with a state court judgment. Feldman, 460 U.S. at 482 n.16, 103 S. Ct. at 1315 n.16; Dale v. Moore, 121 F.3d 624, 626 (11th Cir. 1997). A federal claim is inextricably intertwined with a state court judgment "if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25, 107 S. Ct. 1519, 1533 (1987) (Marshall, J., concurring).

In light of the United States Supreme Court's decision vacating the Florida Supreme Court's November 21, 2000, decision, it is unclear at the moment that any

11

final judgments giving rise to Rooker-Feldman concerns now exist. See Bush v. Palm Beach County Canv. Bd., No. 00-836 (U.S. Dec. 4, 2000). No party has called to our attention any final judgments in the Florida state courts upon which a Rooker-Feldman bar reasonably could be based as to these Plaintiffs.[5] Thus, we conclude that Rooker-Feldman does not bar Plaintiffs from bringing these particular constitutional challenges to the implementation of Florida's manual recount provision.

Defendants Broward, Palm Beach, and Volusia County Canvassing Boards also argue that this case is moot because the manual recounts have been completed and the boards have filed their certified vote tabulations with the Elections Canvassing Commission. However, we conclude that this case is not moot.

---

[5] For similar reasons, we conclude that neither res judicata nor collateral estoppel bars our consideration of the issue of the constitutionality of Florida's statutory manual recount provision. We look to Florida law to determine the application of these preclusive doctrines. See Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984) (holding that under the Full Faith and Credit Act, a federal court must give the same preclusive effect to a state court judgment as another court of that state would give). Florida adheres to the traditional requirement of mutuality of parties in its application of res judicata. See Albrecht v. State of Florida, 444 So. 2d 8, 11 (Fla. 1984); State Street Bank & Trust Co. v. Badra, 765 So. 2d 251, 253 (Fla. Dist. Ct. App. 2000) (citing Youngblood v. Taylor, 89 So. 2d 503, 505 (Fla. 1956)). The parties to this case are not the same parties that appeared before the Florida Supreme Court. Florida similarly requires mutuality of parties in the application of collateral estoppel. See Stogniew v. McQueen, 656 So. 2d 917, 919-20 (Fla. 1995). Further, the doctrine of collateral estoppel bars identical parties from relitigating only those issues that have previously been decided between them. See Mobil Oil Corp. v. Shevin, 354 So.2d 372, 374 (Fla. 1977). Where, as here, the issue in dispute has not been fully litigated, the doctrine is inapplicable. We therefore conclude that neither res judicata nor collateral estoppel bars our review of the constitutionality of Florida's manual recount provision.

Article III of the Constitution limits federal court jurisdiction to live cases or controversies, and the "case-or-controversy" requirement "subsists through all stages of federal judicial proceedings, trial and appellate." Lewis v. Continental Bank Corp., 494 U.S. 472, 477, 110 S. Ct. 1249, 1253 (1990). This Court has held that "[a] claim for injunctive relief may become moot if: (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Reich v. Occupational Safety & Health Review Comm'n, 102 F.3d 1200, 1201 (11th Cir. 1997).

We conclude that neither of these elements is satisfied in this case. The Democratic candidate, Vice President Gore, and others are currently contesting the election results in various lawsuits in numerous Florida state courts. There are still manual recount votes from at least Volusia and Broward Counties in the November 26th official election results of the Florida Secretary of State.[6] In view of the complex and ever-shifting circumstances of the case, we cannot say with any confidence that no live controversy is before us.[7]

---

[6] There may also be some manual recount votes in those results from a number of other Florida counties, such as Seminole, Gadsden, and Polk.

[7] Read broadly, Plaintiffs' request for injunctive relief can be interpreted as a request that Defendants be ordered to certify only those vote totals that resulted from machine recounts. Because Florida Secretary of State Harris has certified the election results and because

13

IV.

Defendants argue that we should abstain from hearing this case under

Burford v. Sun Oil Co., 319 U.S. 315, 63 S. Ct. 1098 (1943), or under Railroad

Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643 (1941). We conclude

that abstention is not appropriate in this case.

The Burford abstention doctrine allows a federal court to dismiss a case only

if it presents difficult questions of state law bearing on policy problems of

substantial public import whose importance transcends the result in the case then at

bar, or if its adjudication in a federal forum would disrupt state efforts to establish

a coherent policy with respect to a matter of substantial public concern. See Boyes

v. Shell Oil Prods. Co., 199 F.3d 1260, 1265 (11th Cir. 2000) (citing New Orleans

Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 361, 109 S.

Ct. 2506, 2514 (1989)). A central purpose furthered by Burford abstention is to

protect complex state administrative processes from undue federal interference.

See New Orleans Pub. Serv., 491 U.S. at 362, 109 S. Ct. at 2515. The case before

us does not threaten to undermine all or a substantial part of Florida's process of

---

she is not yet a party to this appeal, we note that there is some question whether this Court could order the requested relief once the Defendant canvassing boards have completed their manual recounts and have certified their vote totals to the state Elections Canvassing Commission. However, because we deny Plaintiffs' motion for a preliminary injunction, we need not address this issue.

14

conducting elections and resolving election disputes. Rather, Plaintiffs' claims in this case target certain discrete practices set forth in a particular state statute. Further, Burford is implicated when federal interference would disrupt a state's effort, through its administrative agencies, to achieve uniformity and consistency in addressing a problem. See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 727-28, 116 S. Ct. 1712, 1727 (1996). This case does not threaten to undermine Florida's uniform approach to manual recounts; indeed, the crux of Plaintiffs' complaint is the absence of strict and uniform standards for initiating or conducting such recounts. Finally, we note that Burford abstention represents an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188, 79 S. Ct. 1060, 1063 (1959). We do not believe that the concerns raised by Defendants in this case justify our abstention under this narrow doctrine.

Perhaps the most persuasive justification for abstention advanced by Defendants is based on Pullman, 312 U.S. 496, 61 S. Ct. 643; however, we conclude that abstention under this doctrine would not be appropriate. Under the Pullman abstention doctrine, a federal court will defer to "state court resolution of underlying issues of state law." Harman v. Forssenius, 380 U.S. 528, 534, 85 S. Ct. 1177, 1181 (1965). Two elements must be met for Pullman abstention to

15

apply: (1) the case must present an unsettled question of state law, and (2) the question of state law must be dispositive of the case or would materially alter the constitutional question presented. See id. at 534, 85 S. Ct. at 1182. The purpose of Pullman abstention is to "avoid unnecessary friction in federal-state functions, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." Id. Because abstention is discretionary, it is only appropriate when the question of state law can be fairly interpreted to avoid adjudication of the constitutional question. See id. at 535, 85 S. Ct. at 1182.

Plaintiffs claim that Florida's manual recount provision is unconstitutional because the statute does not provide sufficient standards to guide the discretion of county canvassing boards in granting a request for a manual recount or in conducting such a recount. There has been no suggestion by Defendants that the statute is appropriately subject to a more limited construction than the statute itself indicates.

Our conclusion that abstention is inappropriate is strengthened by the fact that Plaintiffs allege a constitutional violation of their voting rights. In considering abstention, we must take into account the nature of the controversy and the importance of the right allegedly impaired. See Edwards v. Sammons, 437 F.2d

16

1240, 1243 (5th Cir. 1971) (citing, as examples of cases where the Supreme Court referred to the nature of the right involved in upholding a refusal to abstain, Harman, 380 U.S. at 537, 85 S. Ct. at 1183 (voting rights); Griffin v. County Sch. Bd. of Prince Edward County, 377 U.S. 218, 84 S. Ct. 1226 (1964) (school desegregation); Baggett v. Bullitt, 377 U.S. 360, 84 S. Ct. 1316 (1964) (First Amendment rights)). Our cases have held that voting rights cases are particularly inappropriate for abstention. See Duncan v. Poythress, 657 F.2d 691, 697 (5th Cir. Unit B 1981) (stating that while an alleged denial of voting rights does not preclude federal abstention, Supreme Court precedent indicates that a federal court should be reluctant to abstain when voting rights are at stake); Edwards, 437 F.2d at 1244 (stating the general rule that abstention is not appropriate "in cases involving such a strong national interest as the right to vote"). In light of this precedent, the importance of the rights asserted by Plaintiffs counsels against our abstention in this case; although, as discussed below, we are mindful of the limited role of the federal courts in assessing a state's electoral process.

We therefore conclude that abstention is not appropriate.

V.

This is an appeal from the denial of a preliminary injunction. Plaintiffs state two main claims. First, Plaintiffs argue that Florida's manual recount scheme, and

17

particularly Fla. Stat. § 102.166(7), is unconstitutional because it contains no standards for when a ballot not read by the machine may be counted. They describe their claim as an "as-applied" challenge based on the allegedly standardless and partisan application of the (allegedly facially standardless) statute in Palm Beach, Broward, Dade, and Volusia Counties. Plaintiffs' chief objection is that different criteria used by different counties, or by different election officials within a county, may mean that the same ballot rejected in one instance is accepted in another instance, or vice versa. They contend that such unequal treatment violates the Equal Protection Clause and that the lack of standards by itself violates the Due Process Clause. Plaintiffs also contend that the absence of statutory standards for when a manual recount occurs permits arbitrary and partisan decision-making, exacerbates the potential for unequal treatment of ballots, and thus warrants a federal court's intervention.

Second, Plaintiffs assert that they are denied due process and equal protection because, under Fla. Stat. § 102.166(4), ballots in one county may be manually recounted while ballots in another county are not. They contend that, as a result, similarly situated voters will not be treated similarly based purely on the fortuity of where they reside; a ballot that would be counted in one county pursuant

to a manual recount may not be counted elsewhere because that voter's county did not conduct such a recount.

Defendants, as well as the Intervenor-Appellee, dispute all of these contentions. They argue that Florida law does contain constitutionally adequate standards for evaluating when a manual recount should occur and for evaluating the ballots during such a recount, and that Plaintiffs' as-applied claim fails because no record evidence shows that those standards have been employed in an arbitrary or partisan fashion. They also maintain that allowing decisions to be made on whether a manual recount occurs on a county-by-county basis is reasonable and consistent with the approach taken by other states, and that in any event no constitutional violation is present for many reasons, such as there is no record evidence indicating that a recount request was made and accepted in one Florida county while a request made in a different county was rejected. More generally, they raise a series of arguments for the proposition that Plaintiffs' challenge to Florida's election laws does not rise to a level that would warrant federal intervention.

The district court, weighing the parties' arguments, determined that Plaintiffs had failed to show a substantial likelihood of success on the merits. We have reviewed the competing arguments. To some extent, our consideration of

19

these arguments is shaped by the practical difficulties of marshaling an adequate record when ongoing and unexpected events continually alter the key facts. In this case, only limited affidavits and a few documents were introduced into the record before the district court. No formal discovery has been undertaken, and, as yet, no evidentiary hearing has been held in this case. Many highly material allegations of facts are vigorously contested. Preliminary injunction motions are often, by necessity, litigated on an undeveloped record. But an undeveloped record not only makes it harder for a plaintiff to meet his burden of proof, it also cautions against an appellate court setting aside the district court's exercise of its discretion.

However, we need not decide the merits of the case to resolve this appeal, and therefore, do not decide them at this time. The district court rejected Plaintiffs' preliminary injunction motion not only because it found no likelihood of success on the merits, but also on the separate and independent ground that Plaintiffs had failed to show that irreparable injury would result if no injunction were issued. We may reverse the district court's order only if there was a <u>clear</u> abuse of discretion. <u>See, e.g.</u>, <u>Carillon Importers, Ltd. v. Frank Pesce Int'l Group Ltd.</u>, 112 F.3d 1125, 1126 (11th Cir. 1997) (per curiam); <u>Revette v. International Ass'n of Bridge, Structural & Ornamental Iron Workers</u>, 740 F.2d 892, 893 (11th Cir. 1984) ("The district court's decision will not be reversed unless there is a clear abuse of

discretion."); <u>Harris Corp. v. National Iranian Radio & Television</u>, 691 F.2d 1344, 1354 (11th Cir. 1982). Because Plaintiffs still have not shown irreparable injury, let alone that the district court clearly abused its discretion in finding no irreparable injury on the record then before it, the denial of the preliminary injunction must be affirmed on that basis alone.

A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. <u>See</u> <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1306 (11th Cir. 1998) (citing <u>All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.</u>, 887 F.2d 1535, 1537 (11th Cir. 1989)). In this Circuit, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to each of the four prerequisites. <u>Id.</u> (internal citation omitted); <u>see also</u> <u>Texas v. Seatrain Int'l, S.A.</u>, 518 F.2d 175, 179

(5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and plaintiff must clearly carry the burden of persuasion).[8]

A showing of irreparable injury  is "'the sine qua non of injunctive relief.'" Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting Frejlach v. Butler, 573 F.2d 1026, 1027 (8th Cir. 1978)); see also Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S. Ct. 2561, 2568 (1975) ("The traditional standard for granting a preliminary injunction requires the plaintiff to show that in the absence of its issuance he will suffer irreparable injury."); Robertson, 147 F.3d at 1306 (plaintiff must show "irreparable injury will be suffered"); Harris Corp., 691 F.2d at 1356-57 (concluding that district court "did not abuse its discretion in finding a substantial likelihood of irreparable injury to [the plaintiff] absent an injunction"); Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981) (to be granted a preliminary injunction plaintiffs must show "a substantial likelihood that they would suffer irreparable injury").[9]

---

[8] The Eleventh Circuit, in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[9] We have occasionally spoken of requiring a substantial "threat" of irreparable harm.  See Haitian Refugee Ctr., Inc. v. Baker, 949 F.2d 1109, 1110 (11th Cir. 1991) (per curiam).  We do not read those opinions, however, as intending to relax the traditional standard -- stated by the Supreme Court -- that a plaintiff must show either that he will suffer, or faces a substantial likelihood that he will suffer, irreparable injury.  See e.g., Doran, 422 U.S. at 931, 95

22

Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper. See Snook v. Trust Co. of Georgia Bank of Savannah, N.A., 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of preliminary injunction even though plaintiff established likelihood of prevailing because plaintiff failed to meet burden of proving irreparable injury); City of Jacksonville, 896 F.2d at 1285 (reversing preliminary injunction based solely on plaintiff's failure to show irreparable injury); Flowers Indus. v. FTC, 849 F.2d 551, 552 (11th Cir. 1988) (same); United States v. Lambert, 695 F.2d 536, 540 (11th Cir. 1983) (affirming denial of preliminary injunction and stating that a plaintiff's "success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm"). As we have emphasized on many occasions, the asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." City of Jacksonville, 896 F.2d at 1285 (quoting Tucker Anthony Realty Corop. v. Schlesinger, 888 F.2d 969, 973 (2d Cir. 1989)); accord, Chacon v. Granata, 515 F.2d 922, 925 (5th Cir. 1975) ("An

S. Ct. at 2568. In any event, the outcome is the same even using substantial "threat" as the benchmark.

23

injunction is appropriate only if the anticipated injury is imminent and irreparable.").

At this time, Plaintiffs cannot demonstrate a threat of continuing irreparable harm. At the moment, the candidate Plaintiffs (Governor Bush and Secretary Cheney) are suffering no serious harm, let alone irreparable harm, because they have been certified as the winners of Florida's electoral votes notwithstanding the inclusion of manually recounted ballots. Moreover, even if manual recounts were to resume pursuant to a state court order,[10] it is wholly speculative as to whether the results of those recounts may eventually place Vice President Gore ahead. See Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994) ("a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate -- as opposed to a merely conjectural or hypothetical -- threat of future injury"). At the moment it also remains speculative whether such an order may be forthcoming. Indeed, the Florida Circuit Court in Leon County considering the Vice President's contest to the final certification has now denied the Vice President's request for resumption of manual recounts as part of its broader judgment in the entire contest action. This development reinforces that the

_____

[10]    This case involves discretionary recounts ordered by county canvassing boards. A recount ordered by a state court under state law in a contest proceeding might be a substantially different case, raising different legal issues.

24

candidate Plaintiffs are suffering no serious harm.  Moreover, as noted earlier, the United States Supreme Court has now vacated the Florida Supreme Court's decision, raising still further doubt about the likelihood of any substantial injury.

Nor are the voter Plaintiffs (all of whom allege that they voted for Governor Bush and Secretary Cheney) suffering serious harm or facing imminent injury.  No voter Plaintiff claims that in this election he was prevented from registering to vote, prevented from voting or prevented from voting for the candidate of his choice.  Nor does any voter claim that his vote was rejected or not counted.  The cases called to our attention by the parties that have warranted immediate injunctive relief  have involved these kind of circumstances.  Even assuming Plaintiffs can assert some kind of injury, they have not shown the kind of serious and <u>immediate</u> injury that demands the extraordinary relief of a preliminary injunction.  Additionally, any alleged voter injury, unrelated to the outcome of the election certified by the Florida Secretary of State, can be adequately remedied later.  And although these Plaintiffs assert that Florida's existing manual recount scheme must be invalidated for now and in the future,  no one suggests that another election implicating those procedures is underway or imminent.

Plaintiffs' other allegations of irreparable injuries to justify a preliminary injunction are unconvincing.  The candidate Plaintiffs contend that if the manual

25

recounts are allowed to proceed, simply rejecting the results of those recounts after the conclusion of this case will not repair the damage to the legitimacy of the Bush Presidency caused by "broadcasting" the flawed results of a recount that put Vice President Gore ahead. But the pertinent manual recounts have already been concluded, and the results from those recounts widely publicized. Moreover, we reject the contention that merely counting ballots gives rise to cognizable injury.

Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however. See, e.g., City of Jacksonville, 896 F.2d at 1285 ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation."); Cunningham v. Adams, 808 F.2d 815, 821-22 (11th Cir. 1987) (affirming denial of preliminary injunction in action alleging Fourteenth Amendment violations, and finding no abuse of discretion in district court's rejection of the plaintiff's argument that "irreparable injury will be presumed where there has been a violation of substantive constitutional rights"); see also Hohe v. Casey, 868 F 2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."). The only areas of constitutional jurisprudence where we

have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether. See City of Jacksonville, 896 F.2d at 1285 (citing Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir. 1983) and Deerfield Med. Ctr., 661 F.2d at 338); see also Hohe, 868 F.2d at 72-73 ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits. Rather, . . . it is the 'direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury.'") (quoting Cate, 707 F.2d at 1188)). This is plainly not such a case. Cf. City of Mobile v. Bolden, 446 U.S. 55, 76, 100 S. Ct. 1490, 1505 (1980) (constitutional right to vote, and the principle of equality among voters, is conferred by the Equal Protection Clause of the Fourteenth Amendment) (citing Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362 (1964)).

Simply put, this principle is the law: we may reverse a district court's denial of a preliminary injunction if and only if we find that the court clearly

abused its discretion.[11]  Our review, therefore, must be highly deferential.  See,

e.g., Carillon Importers, 112 F.3d at 1126 ("The review of a district court's

decision to grant or deny a preliminary injunction is extremely narrow in scope.");

Revette, 740 F.2d at 893 ("Appellate review of such a decision is very narrow.").

As we have explained:

> This limited review is necessitated because the grant or denial of a
> preliminary injunction is almost always based on an abbreviated set of
> facts, requiring a delicate balancing of the probabilities of ultimate
> success at final hearing with the consequences of immediate
> irreparable injury which could possibly flow from the denial of
> preliminary relief. Weighing these considerations is the responsibility
> of the district court.

Id. (quoting Gray Line Motor Tours, Inc. v. City of New Orleans, 498 F.2d 293,

296 (5th Cir. 1974)) (internal quotation marks and additional citation omitted).

The abuse-of-discretion standard, therefore, serves an important and vital purpose.

In the case now before us, the district court expressly found that Plaintiffs

did not meet their burden of showing that immediate irreparable harm would result

if preliminary injunctive relief were not entered.  It did so largely because the

---

[11]     The district court did not peg its finding of no irreparable harm to any incorrect legal principle.  On the contrary, the district court found that, on the record presented to it, no irreparable harm had been proved.  See Siegel v. LePore, 2000 WL 1687185 (S.D. Fla. Nov. 13, 2000), at *8 ("In addition, we find Plaintiffs' alleged injuries on an as-applied basis to be speculative, and far from irreparable, at this stage in the electoral recount process . . . .  The inconclusive state of these recount processes coupled with their different factual postures counsels against preliminary uniform injunctive relief at this time.").

limited record before it did not support Plaintiffs' claims of harm. That critical finding remains just as compelling, and the irreparability of the alleged injury is no more established, today.

Accordingly, we cannot say that the district court abused its broad discretion in finding that Plaintiffs did not meet their burden of showing at least a substantial likelihood of irreparable injury. Because proof of irreparable injury is an indispensable prerequisite to a preliminary injunction, Plaintiffs are not entitled to a preliminary injunction at this time; and the district court's order must be affirmed. See, e.g., Canal Authority v. Callaway, 489 F.2d 567, 574 (5th Cir. 1974) ("[W]here no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate."). The Court does not at this time decide the merits of Plaintiffs' constitutional arguments.[12]

**AFFIRMED.**

---

[12] A decision by the Court on the likelihood of success would require the Court to reach, in some sense, constitutional questions. Even for those of us who believe that the record will not support a substantial likelihood of success on the merits, it is a "fundamental and longstanding principle of judicial restraint . . . that courts avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. Northwest Indian Cemetary Protective Ass'n, 485 U.S. 439, 445, 108 S. Ct. 1319, 1323 (1988). Given our view on the issue of injury, no necessity is present here.

ANDERSON, Chief Judge, concurring specially:

I join in the opinion of the Court. I subscribe to the entire opinion including, inter alia, the holding and reasoning that Plaintiffs have failed to demonstrate irreparable injury. Although I agree that judicial restraint cautions against the court's addressing constitutional issues unless necessary, it does not seem inappropriate for me in light of the extensive dissents, to discuss my own views about the likelihood of success on the merits of Plaintiffs' constitutional issues.

## I. LIKELIHOOD OF SUCCESS

### A. Standard of Review

A party seeking a preliminary injunction must establish the following four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that its own injury outweighs the injury to the nonmovant; and (4) that the injunction would not disserve the public interest. See Haitian Refugee Center, Inc. v. Baker, 949 F.2d 1109, 1110 (11th Cir. 1991).

I note at the outset that the scope of this review of the district court's denial of injunctive relief is limited to whether the district court abused its discretion. See Sierra Club v. Georgia Power Co., 180 F.3d 1309, 1310 (11th Cir. 1999) ("The

grant or denial of a preliminary injunction is a decision within the sound discretion of the district court."). The district court must exercise its discretion "in deciding upon and delicately balancing the equities of the parties involved." United States v. Lambert, 695 F.2d 536, 539 (11th Cir. 1983) (quoting Tatum v. Blackstock, 319 F.2d 397, 401-02 (5th Cir. 1963)). In this review, I adopt the district court's findings of fact unless clearly erroneous, but I review de novo jurisdictional issues and issues of law. See SEC v. Unique Financial Concepts, Inc., 196 F.3d 1195, 1198 (11th Cir. 1999). "Because a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." Lambert, 695 F.2d at 539 (quoting Texas v. Seatrain Int'l, S.A., 518 F.2d 175, 179 (5th Cir. 1975)).

## B. Constitutional Delegation of Authority to the States

The Constitution delegates to the states the authority to establish and implement procedures for selecting Presidential electors. The Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors. . . ." U.S. Const. art. II, § 1, cl. 2.[1] The United

---

[1] Article II, Section 1, Clause 2 of the Constitution provides:

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of

States Code provides that the timely appointment of Presidential electors pursuant to state law is conclusive. See 3 U.S.C. § 5.[2] The Supreme Court has confirmed this broad delegation of power to the states, subject to the limitation that a state may not exercise this power in a manner that violates specific provisions of the Constitution of the United States. See McPherson v. Blacker, 146 U.S. 1, 13 S. Ct. 3 (1892). See also Anderson v. Celebrezze, 460 U.S. 780, 796 n.18, 103 S. Ct. 1564, 1573 n.18 (1983) (stating that "[t]he Constitution expressly delegates authority to the States to regulate the election of Presidential electors," but that this does not give states the power to impose unconstitutional burdens on the right to vote); Williams v. Rhodes, 393 U.S. 23, 29, 89 S. Ct. 5, 9 (1968) (stating that the

---

Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

[2]    3 U.S.C. § 5 provides:

If any State shall have provided, by laws enacted prior to the day fixed for the appointment of the electors, for its final determination of any controversy or contest concerning the appointment of all or any of the electors of such State, by judicial or other methods or procedures, and such determination shall have been made at least six days before the time fixed for the meeting of the electors, such determination made pursuant to such law so existing on said day, and made at least six days prior to said time of meeting of the electors, shall be conclusive, and shall govern in the counting of the electoral votes as provided in the Constitution, and as hereinafter regulated, so far as the ascertainment of the electors appointed by such State is concerned.

32

extensive powers granted to the states to pass laws regulating the selection of electors is subject to the limitation that these powers "may not be exercised in a way that violates other specific provisions of the Constitution"); Duncan v. Poythress, 657 F.2d 691, 699 (5th Cir. Unit B 1981) (stating that while the Constitution provides no guarantee against innocent irregularities in the administration of state elections, in rare situations where state election procedures undermine the basic fairness and integrity of the democratic system, a constitutional violation exists).

While the unconstitutional exercise of state power is prohibited, the Supreme Court has recognized that a state's regulations governing the electoral process will inevitably impact, in a manner that may burden or restrict, its citizens' exercise of their right to vote. See Burdick v. Takushi, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992); Anderson, 460 U.S. at 788, 103 S. Ct. at 1570. The Supreme Court has acknowledged that such restrictions are necessary "if [elections] are to be fair and honest . . . ." Storer v. Brown, 415 U.S. 724, 730, 94 S. Ct. 1274, 1279 (1974). In the context of a Presidential election, the Supreme Court has confirmed that a state's interest in conducting an orderly and fair election is "generally sufficient to justify reasonable, nondiscriminatory restrictions." Anderson, 460 U.S. at 788, 103 S. Ct. at 1570.

33

To preserve the essential balance between states' power to govern elections and voters' constitutional rights, the Supreme Court has developed a flexible standard to use in assessing constitutional challenges to a state's regulation of elections. The Supreme Court described this standard succinctly in Burdick v. Takushi, 504 U.S. 428, 112 S. Ct. 2059 (1992):

> [W]hen [First and Fourteenth Amendment] rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions.

Id. at 434, 112 S. Ct. at 2063 (internal quotation marks and citations omitted).

Our Circuit's precedent addressing constitutional challenges to state election processes has reflected comparable deference to state regulation of elections. We have held that the scope of voters' exercise of their right to vote is restricted in the state election context by considerations of "[t]he functional structure embodied in the Constitution, the nature of the federal court system and the limitations inherent in the concepts both of limited federal jurisdiction and the remedy afforded by section 1983 . . . ." Gamza v. Aguirre, 619 F.2d 449, 452-53 (5th Cir. 1980);[3] see

---

[3] The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

also Curry v. Baker, 802 F.2d 1302, 1314 (11th Cir. 1986) ("Although federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election. Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation.") (internal citation omitted); Duncan, 657 F.2d at 701. We have emphasized that federal court intervention is not appropriate in "garden variety" disputes over election irregularities, but that redress of alleged constitutional injuries is appropriate if "the election process itself reaches the point of patent and fundamental unfairness . . . ." Roe v. Alabama, 43 F.3d 574, 580 (11th Cir. 1995) (quoting Curry, 802 F.2d at 1315).

These principles guide my analysis of the Plaintiffs' likelihood of success in their constitutional challenges to Florida's election laws. The Plaintiffs argue on appeal that the district court erred by refusing to enjoin the post-election manual recounting of ballots in four Florida counties, because they allege that these recounts violate the constitutional rights of the state's voters. The Plaintiffs advance two arguments, an equal protection argument and a substantive due process argument. I discuss each in turn and cannot conclude based on the sparse record before this Court that the district court abused its discretion in denying the

Plaintiffs' motion for preliminary injunctive relief. I believe that the Plaintiffs have failed to establish with sufficient clarity a severe burden or impact on the rights of Florida voters. See Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 ("Preliminary injunctions of legislative enactments – because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits – must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution."). Rather, the alleged impacts are reasonable and are justified by their furtherance of the state's important regulatory interests in ensuring accurate and complete election results. Accordingly, the Plaintiffs fail to make the requisite showing of a substantial likelihood of success on the merits of their claims, and the district court thus did not abuse its discretion in refusing to grant a preliminary injunction.

C. Equal Protection Claim

The Plaintiffs claim that Florida's statutory manual recount provision as applied in this case violates the rights of all voters to be treated equally because the manual recounts are limited to four heavily Democratic counties. The crux of the

36

Plaintiffs' equal protection argument is that some ballots in counties not conducting manual recounts will not be counted despite the voters' intent, because the ballots are not machine-legible, while identical ballots in counties conducting manual recounts will be counted.[4]  The argument boils down to this:  there is greater certainty in some counties than in others that every voter's intent is effectuated.  I conclude that this argument fails to state a violation of the equal protection clause.

Under the framework developed by the Supreme Court, when a state election law severely burdens voters' constitutional rights, it must be narrowly tailored to serve a compelling interest; however, lesser burdens trigger less exacting review, and a state's important regulatory interests are typically enough to justify reasonable, nondiscriminatory restrictions.  Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S. Ct. 1364, 1370 (1997) (citing Burdick, 504 U.S. at 434, 112 S. Ct. at 2063).

---

[4]     For example, the Plaintiffs point to the fact that some ballots that are imperfectly punched will be counted in at least one manual-recount county, while an identical ballot would not be machine-counted, and thus would not be counted in a county not conducting manual recounts.  In Florida Democratic Party v. Palm Beach County Canvassing Bd., No. 00-11078 (Fla. Palm Beach Co. Cir. Ct., Nov. 22, 2000), Circuit Judge Jorge Labarga held that the Palm Beach County Canvassing Board could not follow a policy of per se exclusion of any ballot, but that each ballot must be considered in light of the totality of circumstances and that where the voter's intent could be fairly and satisfactorily ascertained, that intent should be given effect.

The first step in this analysis, then, is to determine whether Florida's manual recount provision severely burdens the rights of those voters in counties not conducting manual recounts, because their ballots receive less scrutiny than those of voters in counties conducting manual recounts. I believe that it does not.

In reaching this conclusion, I note first that the Plaintiffs could not credibly argue that the mere availability of manual recounts in some counties, but not in others, places an inequitable burden on their right to vote. Taking this argument to its logical conclusion would lead to the untenable position that the method of casting and counting votes would have to be identical in all states and in every county of each state. For example, if one state counted ballots by hand while another counted by machine, there inevitably would be some ballots in the manual-recount state that were counted notwithstanding the fact that the identical ballot in the machine-count state would not be counted. The only apparent way to avoid this disparity would be for every state to use an identical method of counting. No court has held that the mere use of different methods of counting ballots constitutes an equal protection violation. Such a position would be manifestly inconsistent with the command of Article II, Section 1, Clause 2, that Presidential electors are to be appointed in the manner directed by each state legislature. Accord Anderson, 460 U.S. at 796 n.18, 103 S. Ct. at 1573 n.18; Williams, 393 U.S. 23 at 29, 89 S.

38

Ct. at 9. Moreover, there is nothing uncommon or unusual in a state statute permitting and regulating recounts. The Supreme Court has acknowledged that recount procedures are a common and practical means of ensuring fair and accurate election results. See Roudebush v. Hartke, 405 U.S. 15, 25, 92 S. Ct. 804, 810-11 (1972). In Roudebush, the Supreme Court noted with approval that Indiana, along with many other states, had made vote recounts available to guard against irregularity or error in the tabulation of votes, and the Court stated that such recount provisions are "within the ambit of the broad powers delegated to the States by Art. I, § 4." Id.

The Plaintiffs attempt to bolster their treat-every-ballot-alike argument by suggesting that partisan influences have tainted the operation of Florida's manual recount procedures in this case. The Plaintiffs allege that partisan influences have intruded in two ways: (1) that the Florida Democratic Party selectively requested manual recounts in a few populous counties that indicated significantly more Gore votes than Bush votes in order to gain political advantage; and (2) that the lack of statutory standards guiding the canvassing boards' decisions to grant manual recounts permitted partisan influences to influence those decisions.

The statute itself provides several safeguards against the kind of abuses suggested by the Plaintiffs. Pursuant to the statute, a candidate or party can only

39

request, not mandate, a manual recount, and the decision is made by a county canvassing board composed of three statutorily designated officials, including a county court judge, none of whom are active participants in the candidacy of any candidate. See Fla. Stat. §102.141. The canvassing board's discretion is not standardless, but rather is guided by a statutory purpose of determining the intention of voters and correcting "an error in the vote tabulation which could affect the outcome of the election." Id. §102.166(5). Florida law further provides that canvassing board meetings must be open to the public. See id. §286.0105(1). Finally, a canvassing board's decision to grant or deny a manual recount is subject to judicial review. See Broward County Canvassing Bd. v. Hogan, 607 So. 2d 508 (Fla. 4th DCA 1992). Once a manual recount has been authorized, statutory safeguards are provided to ensure that the results are fair and accurate, and untainted by partisan manipulation.[5] The combination of the composition of the canvassing boards, the statutory standards guiding their discretion, and the availability of judicial review provides meaningful checks on the exercise of discretion by canvassing boards, and reduces the risk of partisan influences tainting the process.

---

[5]     These provisions are described infra at 27.

Especially with respect to the Plaintiffs' concern that political candidates can select particular counties, but also relevant to the Plaintiffs' concern about the discretion of canvassing boards, any candidate has an equal right and an equal opportunity to request manual recounts in any county. See Fla. Stat. §102.166(4)(a). The Florida statute clearly placed the political parties in this case on notice of this right and opportunity.[6] Other safeguards relevant to both of the Plaintiffs' concerns include: the fact that both the request and decision must be guided by the statutory standards of determining voters' intent and correcting error which could affect the outcome, see id. §102.166(5), (7)(b); the fact that the decision is made, not by an ad hoc board, but by an existing board composed of statutorily designated officials, including a county judge, who are not active participants in the candidacy of any candidate, see id. §102.141; the fact that canvassing board meetings and any manual recounts must be open to the public, see id. §§ 102.166(6), 286.0105(1); and the fact that a canvassing board's decision

---

[6] The Plaintiffs do not claim to have lacked timely actual notice that manual recounts were requested by the Florida Democratic Party in the four counties at issue in this case. Indeed, the record reveals that the manual recounts were requested on Thursday, November 9, 2000, and that the Republican Party representatives in Miami-Dade County and Broward County filed responses opposing the manual recounts on the same day, well within the 72-hour statutory deadline for making requests in other counties, i.e., midnight on Friday, November 10, 2000.

is subject to judicial review.  See Broward County Canvassing Bd., 607 So. 2d at 508.

In assessing the severity of the impact on the right to vote, the scarcity of evidence in the instant record is also significant.  On the sparse record in this appeal, I cannot conclude that Plaintiffs have made the showing requisite for relief at this preliminary judgment stage.  I cannot conclude that Plaintiffs have established actual partisan manipulation or fraud.  The Plaintiffs do not claim that any canvassing board  unfairly refused to conduct a manual recount.  They argue on appeal that canvassing board officials may have a strong personal interest in the outcome of the election; however, such a vague allegation of a possible manipulative or discriminatory motive does not rise to the level of severity required to merit strict scrutiny of the Plaintiffs' equal protection claims.

Applying a reasonableness standard, therefore, to judge the constitutionality of Florida's manual recount provision, see Burdick, 504 U.S. at 434, 112 S. Ct. at 2063, I would conclude that the state has sufficiently strong interests to justify the manual recounting of votes within the established statutory framework.  As provided by the plain language of the statute, the manual recount provisions are designed to remedy errors in the vote tabulation "which could affect the outcome of the election" and to arrive at the true "voters' intent."  Fla. Stat. §§ 102.166(5),

42

(7)(b). Florida has a strong interest in ensuring that the results of an election accurately reflect the intent of its voters. A manual recount provision as a supplement to mechanical counting provides a valid method to discern the will of voters, where doubt is raised as to the validity of a machine count.

With respect to the county-by-county differences which the Plaintiffs allege violate their equal protection rights, the state legislature expressly delegated to each county the decision-making authority regarding whether and how to conduct manual recounts, within the context of the statutory standard and procedures, and subject to the statutory restraints and safeguards, all as discussed above. There are strong and obvious state interests, both practical and administrative, supporting Florida's decentralization of this function to the county level. I cannot conclude that the Constitution would require that any manual recount be conducted statewide.[7] A statewide requirement would impose a very significant administrative burden, and an often unnecessary one, as there are innumerable circumstances in which a manual recount would be warranted only in a single county. The decision to decentralize is both reasonable and nondiscriminatory. Indeed, in doing so, Florida is merely exercising the power expressly delegated in Art. II, § 1, cl. 2, and it is exercising that power by following the same pattern of

---

[7] Many states decentralize this process without requiring statewide recounts.

43

federalism reflected in the Constitution itself. Further, with respect to Florida's designation of candidates and parties as the entities authorized to request a manual recount, this would seem to be a natural and reasonable choice. They are the ones most likely to be alert to problems with a machine tally.[8] Permitting only candidates, political parties and committees, but not individual voters, to request recounts is a common practice among the states.[9] I believe that Florida's interest in the efficient administration of elections is sufficient to justify its decision to provide for the implementation of its manual recount provision on a decentralized, localized basis.

My conclusion that the deprivation of rights alleged by the Plaintiffs does not merit strict scrutiny is supported by the contrast between this case and cases in

---

[8] There are obvious and powerful reasons not to permit individual voters to trigger a manual recount; their interests are adequately represented by the candidates and parties, and individual voter participation would likely lead to administrative nightmares.

[9] Many states permit a recount to be triggered only upon the request of a candidate, political party and/or a political committee, but not upon the appeal of an individual voter. See e.g., ARK. CODE ANN. § 7-5-319 (candidate); COLO. REV. STAT. § 1-10.5-106 (candidate); IDAHO CODE § 34-2301 (candidate); IND. CODE ANN. § 3-12-11-1 (candidate or political party's county chairperson); IOWA CODE § 50.48 (candidate); LA. REV. STAT. § 1451 3-12-11-1 (candidate or political party); ME. REV. STAT. ANN. tit. 21-A, § 737-A (losing candidate); MD. CODE. ANN., Elections § 12-101 (losing candidate); MO. REV. STAT. § 115.553 (candidate); N.J. STAT. ANN. § 19:28-1 (candidate); OKLA. STAT. ANN. tit. 26, § 8-111 (candidate); OR. REV. STAT. § 258.161 (candidate, political party or county clerk); TEX. ELEC. CODE ANN. § 212.023 (candidate); VA. CODE ANN. § 24.2-800 (candidate); WASH. REV. CODE § 29.64.010 (candidate or political party); W. VA. CODE § 3-6-9 (candidate); WIS. STAT. ANN. § 9.01 (candidate); WYO. STAT. ANN. §§ 22-16-109 & 110 (losing candidate or county canvassing board).

which the Supreme Court has applied strict scrutiny: those cases have involved a complete deprivation of the right to vote or a differential weighting of votes based on impermissible classifications. In O'Brien v. Skinner, 414 U.S. 524, 94 S. Ct. 740 (1974), the Supreme Court applied strict scrutiny to invalidate a state electoral scheme that completely denied individuals the right to vote based on arbitrary distinctions. See id. at 533, 94 S. Ct. at 745 (invalidating a New York absentee ballot statute that operated to deny otherwise eligible prisoners the right to vote, based solely on the prisoner's county of incarceration). The reasoning of O'Brien does not apply here, however, as the Plaintiffs do not assert that they have been denied the right to vote or to have their vote counted; rather, they assert that their votes have received unequal treatment in the post-election counting process.

In the one-person, one-vote cases, the Supreme Court has held that states' weighted voting systems, which arbitrarily and systematically granted a lesser voice to some voters based on their geographic location, violated the voters' right to equal protection. See Moore v. Ogilvie, 394 U.S. 814, 819, 89 S. Ct. 1493, 1496 (1969); Reynolds v. Sims, 377 U.S. 533, 563, 84 S. Ct. 1362, 1382 (1964); Roman v. Sincock, 377 U.S. 695, 709-10, 84 S. Ct. 1449, 1458 (1964); Gray v. Sanders, 372 U.S. 368, 379-80, 83 S. Ct. 801, 808 (1963). The facts presented by those cases are different from the facts here, however. The ballots of voters in Florida

45

counties conducting manual recounts are not receiving greater weight than are votes elsewhere in Florida. The additional scrutiny of ballots afforded under Florida's manual recount procedures does not weigh the value of votes; it merely verifies the count. Unlike the foregoing cases which have held that the systematic unequal weighting of votes is unconstitutional, here there is no automatic, inevitable, or systematic granting of greater weight to the choices of any voter or class of voters.

This conclusion is further supported by the fact that the Constitution itself, in Article II, § 1, cl. 2, contemplates that each state will direct its own (potentially different) method of appointing Presidential electors. Within each state, federal courts have acknowledged that diverse methods of voting may be employed. See Hendon v. North Carolina State Bd. of Elections, 710 F.2d 177, 181 (4th Cir. 1983) (citing Carrington v. Rash, 380 U.S. 89, 91, 85 S. Ct. 775, 777 (1965)). The Supreme Court has confirmed that recounts are well within the ambit of a state's authority, see Roudebush, 405 U.S. at 25, 92 S. Ct. at 810-11, and the manual counting of ballots has been commonplace historically. In the light of the constitutional delegation of authority to the states, confirmed by case law, I believe that manual recounts in some counties, while identical ballots in other counties are

counted and recounted only by machine, and the inevitable variances that this will produce, do not in themselves severely burden the right to vote.

Florida's statutory manual recount provision does not limit the Plaintiffs' ability to cast their votes, nor significantly undermine the certainty that their votes will be counted. While the statute permits enhanced scrutiny to be given to ballots in counties where the candidates or parties have requested and the canvassing boards have authorized a manual recount, the statute provides ample safeguards to ensure that the decision to conduct manual recounts, and the manner in which the recounts are conducted, is open, fair, and accurate. While there is some potential for the statute to be manipulated by those with partisan interests, the sparse record here does not in my opinion establish a clear showing of partisan fraud or misconduct that would be required in this preliminary injunction stage. Nor does the record reveal concrete evidence of substantial or uncorrected errors in manual counting that have generated erroneous vote tabulations. Therefore, I conclude that at this stage the Plaintiffs have failed to sufficiently demonstrate a severe impact on their equal protection rights, so that heightened scrutiny of Florida's manual recounts is not merited. See Burdick, 504 U.S. at 434, 112 S. Ct. at 2063. I believe that Florida's important regulatory interests are sufficient to justify the

47

reasonable, nondiscriminatory impact the Plaintiffs have shown to their voting

rights. [10]

_____

[10]    Much of Plaintiffs' argument focuses on the assumption that a candidate's self-interest in selecting counties likely to produce more undervotes for him introduces an invidious and unconstitutional discrimination.  My discussion in text reveals the weaknesses which I see in this argument.  In summary, a candidate can only request, not mandate, a recount.  The decision is made by a county canvassing board with several built-in statutory safeguards – including the composition of the board (preordained county officials, including a county judge, none of whom can be active in any candidacy), statutory standards to guide the board's discretion (relating to the intention of voters and an error in the mechanical tabulation), and the fact that the board's meetings must be open and are subject to public scrutiny and court review.  Strong state interests support county-level decentralization; mandating statewide recounts in every instance would impose severe administrative burdens.  Rather than invidious discrimination, I suggest that the statute contemplates that candidates or parties are the appropriate entities to make such request because their self-interest prompts them to be alert to problems in a machine tally which might make a recount appropriate.  Like the statutory contemplation, a requesting candidate would also contemplate that any opposing candidate would be alert to problems in counties favorable to him.  There is an equal right and an equal opportunity in that respect, as stated clearly in the statute.  Nothing in the statute suggests that only a candidate losing in a particular county can make a request in that county; the statutory standard is an error in the vote tabulation that <u>could affect</u> the outcome of the election.  Nothing suggests that the statute means the "outcome" in that particular county; rather, the statute says "outcome of the election" itself.  Nothing suggests that a canvassing board may not consider the potential effects of other recounts in its own decision to authorize a manual recount.  Nothing prevents a candidate or a party requesting a manual recount from notifying a canvassing board of the fact that other counties may authorize or have authorized manual recounts which may change the vote totals.    As applied here, the record before this Court does not reveal a motive by the Democratic Party to deprive the Republican Party of its opportunity to request manual recounts.  The requests challenged here were not strategically delayed; rather, the requests were made on November 9, 2000, more than 24 hours before the 72-hour deadline, leaving ample time for the opposing candidate to make requests in response.  Permitting candidates to request recounts is a reasonable way to promote the state's legitimate and strong interest in ensuring a full and accurate count of ballots where the voters' intention can be fairly and satisfactorily ascertained, especially so when any request is circumscribed by the statutory safeguards provided here.  Indeed, many states permit candidates or political parties to request such recounts; if Plaintiffs' arguments prevail, the status of many state election laws, and many elections, would be constitutionally suspect.

For the foregoing reasons, I would conclude that the Plaintiffs have failed to prove a likelihood of success on the merits of their equal protection claim.

D. Substantive Due Process Claim

The Plaintiffs argue that the counting procedures used by counties conducting manual recounts are arbitrary and rife with irregularities that constitute a denial of due process. Specifically, the Plaintiffs allege that the standards used to decide which marks or punches on a ballot are counted as votes differ from county to county and further that these standards have been changed mid-count in one county. I believe that the record evidence fails to establish that the alleged unreliability or inaccuracy of manual recounting rises to the level of a severe burden on the right to vote.

In Curry v. Baker, 802 F.2d 1302 (11th Cir.1986), we refused to find a constitutional violation in a state gubernatorial candidate's argument that election officials had miscounted ballots. See id. at 1319. We stated that, in order for the election process to reach the point of "patent and fundamental unfairness," the "situation must go well beyond the ordinary dispute over the counting and marking of ballots." Id. at 1315 (quoting Duncan v. Poythress, 657 F.2d 691, 703 (5th Cir. 1981)). In Curry, we emphasized that a federally protected right is implicated only

49

"where the entire election process – including as part thereof the state's administrative and judicial corrective process – fails on its face to afford fundamental fairness.'" Id. at 1317 (quoting Griffin, 570 F.2d at 1078).

These principles resonate in numerous federal cases holding that disputes over human or mechanical errors in ballot counting, absent a showing of intentional manipulation, do not rise to the level of a federal constitutional violation. See Gold v. Feinberg, 101 F.3d 796, 802 (2d Cir.1996) (holding that human errors resulting in the miscounting of votes, the presence of ineligible candidates on ballot, and the late delivery of voting machines to some polling places, did not rise to the level of a constitutional violation because adequate state remedies existed); Bodine v. Elkhart County Elec. Bd., 788 F.2d 1270, 1272 (7th Cir.1986) (concluding that voter-plaintiffs failed to state a constitutional claim where mechanical and human error resulted in errors in counting votes, but where there was no allegation that the defendants acted with intent to undermine the election); Gamza v. Aguirre, 619 F.2d 449, 454 (5th Cir.1980) (concluding that allegations of negligent vote counting did not state a constitutional claim); Hennings v. Grafton, 523 F.2d 861, 864-65 (7th Cir. 1975) (stating that while due process rights would be implicated on a showing of "willful conduct which undermines the organic processes by which candidates are elected," no

50

constitutional guarantee protects against inadvertent errors or irregularities; instead, state law must provide the remedy); Pettengil v. Putnam County R-1 Sch. Dist., 472 F.2d 121, 123 (8th Cir. 1973) (refusing to intervene in a controversy over whether illegally cast ballots were mistakenly counted by local election officials); Powell v. Power, 436 F.2d 84, 88 (2d Cir.1970) (concluding that no federal remedy existed for human error resulting in non-party members mistakenly allowed to vote in congressional primary).

Despite these precedents, in reliance on our opinion in Roe v. Alabama, 43 F.3d 574 (11th Cir. 1995), the Plaintiffs argue that post-election changes in ballot-counting procedures are fundamentally unfair and thus rise above the level of "garden variety" election disputes to constitute a substantive due process violation. In Roe, a state court order would have forced Alabama election officials to count absentee ballots that had been rejected pursuant to a state statute and in accordance with previous state practice.[11] See id. at 578. We concluded that such a post-election departure from the state's statutory mandate and previous election practice would undermine the fundamental fairness of the election. See id. at 581. As we explained in Roe, our decision was based on the fact that such a change would

---

[11]    The applicable Alabama statute required absentee voters to send their ballots accompanied by an affidavit which was either notarized or signed by two witnesses. It was undisputed in Roe that the previous practice in Alabama, as mandated by statute, had been to disregard absentee ballots that were mailed in without the required affidavit.

disenfranchise those people who would have voted absentee, but were deterred from doing so by the burden of complying with the statutory requirements for completing absentee ballots.  See id.; see also Griffin v. Burns, 570 F.2d 1065, 1078-79 (1st Cir.1978) (finding fundamental unfairness in a state's unforeseeable invalidation of absentee ballots which resulted in the disqualification of ten percent of the total votes cast in a primary election).  Cf. Bennett v. Yoshina, 140 F.3d 1218, 1227 (9th Cir. 1998) (rejecting a substantive due process challenge to Hawaii's decision to count blank ballots as votes against convening a state constitutional convention, where there was no suggestion that voters in favor of the constitutional convention had relied on the state's previous practice of disregarding blank ballots in a constitutional convention vote); Partido Nuevo Progresista v. Barreto Perez, 639 F.2d 825, 828 (1st Cir.1980) (holding that the Supreme Court of Puerto Rico's decision to count mismarked ballots where the intent of the voter was clear did not violate due process, because here could have been no detrimental reliance by any voter on the assumed invalidity of mismarked ballots).

Our decision in Roe is distinguishable from the instant case in at least two significant ways.  First, at this stage of the litigation, the record does not establish the requisite showing of a significant post-election departure from Florida's

52

manual recount practices before this election.[12]  Unlike the circumstance in <u>Roe</u>, where the post-election change of procedure violated a statutory mandate, in this case Florida's statute expressly provides for manual recounts and establishes the voter-intent standard to be used in conducting the recounts.  While the Plaintiffs have alleged that various canvassing boards have used different standards or have changed their standards with respect to the analysis of particular physical attributes of ballots, the Plaintiffs have not alleged that any board has departed from a good-faith attempt to determine the voters' intent.  Thus, the Plaintiffs have failed to show any departure from statutory mandate or from a pre-election procedure that rises to the level of fundamental unfairness.

_____

[12]    There remain in the present record sufficient disputed facts as to any significant change of practice that I cannot conclude with the necessary clarity that any significant number of votes was counted pursuant to a changed practice.

My opinion would not change, even assuming that there may have been a change of practice -- i.e., from counting only partially detached chads to counting ballots that were not partially detached, but under the totality of the circumstances the intention of the voter could be fairly and satisfactorily ascertained.  <u>See</u> <u>Florida Democratic Party v. Palm Beach County Canvassing Board</u>, No. 00-11078 (Fla. Palm Beach Co. Cir. Ct., Nov. 22, 2000).  The statutory standard – i.e., the determination of the voter's intent within the Canvassing Board's discretion, subject to judicial review – has remained constant.  Even assuming some change with respect to the discretionary interpretation of particular physical attributes of ballots, there is no evidence in this record that a practice has been implemented which is inconsistent with the plain statutory standard, as was the case in <u>Roe</u>.

53

Second, Roe is distinguishable because this record does not show

detrimental reliance by voters. In this case, there is no evidence to suggest that a

voter in any county failed to adequately punch or mark a ballot in reliance on a

belief that a vote in some other county would not be counted if a ballot were only

partially punched, i.e., in reliance on an anticipated lack of a manual recount.

Indeed, it would be manifestly unreasonable to suggest such reliance. Quite the

contrary, the statute expressly puts voters on notice of the possibility of a manual

recount. As a corollary to this obvious lack of reliance, this case involves no

disenfranchisement of voters, unlike the disenfranchisement in Roe of people who

failed to vote absentee because of the inconvenience imposed by the statutory

notarization/witness requirement.

In addition to the lack of detrimental reliance by voters on Florida's

previously established election procedures, the record before us is not sufficient to

conclude that the district court was clearly erroneous in declining to find

purposeful, systematic discrimination in the manual recounting procedures

employed. In fact, the manual recount statute mandates procedures to ensure

fairness and accuracy in the conduct of any manual recount. Any manual recount

must include at least one percent of the total votes cast and at least three precincts.

See Fla.Stat. §102.166(4)(d). A manual recount must be open to the public, and

54

counting teams must have at least two members who are, when possible, members of at least two political parties. See id. § 102.166(6), (7)(a). Determination of the voter's intent is the statutory standard. See id. § 102.166(7)(b). Florida law provides that the decisions and actions of county canvassing boards are subject to judicial review, not only with respect to their decision on whether to conduct a manual recount, as discussed above, but also with respect to the general validity of their counting procedures. See Beckstrom v. Volusia County Canvassing Bd., 707 So. 2d 720 (Fla. 1998); Boardman v. Esteva, 323 So.2d 259 (Fla. 1975). State courts have authority to review election challenges, whether brought by a candidate or party as a protest under Fla. Stat. § 102.166, or brought by a candidate, qualified voter, or taxpayer as a contest under Fla. Stat. § 102.168. A court may void a challenged election result based on a finding of substantial irregularities that raise a reasonable doubt as to whether the election results express the will of the voters. See Beckstrom, 707 So. 2d at 725. These statutory safeguards are calculated to protect against the risk of the abuses that the Plaintiffs fear. In this case, the Plaintiffs have failed to persuade me that these safeguards were ineffective. The district court found, based on the evidence stipulated at the hearing, that "no evidence has been demonstrated that these recounts have generated erroneous

tabulations." Based on my review of the evidence, I cannot conclude that this finding was clearly erroneous.[13]

Under these circumstances, I am not persuaded that Plaintiffs have made the requisite showing of a severe impact on their right to vote. On this record, they have failed to prove that this case rises above a "garden variety" dispute over the counting of ballots to reach the level of fundamental unfairness. Because Florida's strong state interests, as discussed above, justify a decentralized vote-counting process, I conclude that the Plaintiffs fail to show a likelihood of success in proving their substantive due process claim. Because the Plaintiffs fail to show a substantial likelihood of success on the merits of their constitutional claims, they fail to demonstrate that the district court abused its discretion in denying the motion for preliminary injunctive relief.[14]

---

[13]    While this record reveals isolated observations of acts from which a fact finder might infer an effort to dislodge a chad, I cannot conclude that the district court was clearly erroneous. I see little or no evidence of actual intent to dislodge a chad, or that ballots were counted when they were not already partially dislodged. I also note that the presence of Republican and Democratic observers, in addition to the intense public scrutiny, helps to ensure the integrity of the process.

[14]    The Plaintiffs also allege a First Amendment violation, essentially arguing that Florida's statute grants county canvassing board members unlimited discretion to impinge on voter's rights through arbitrary decisions regarding whether to conduct manual recounts. In another articulation of their argument, the Plaintiffs argue that the canvassing board's decisions are governed by no standards. The Plaintiffs argue that the right to vote is protected by the First Amendment. See Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 10 (1968) (stating that the right to vote is entitled to similar constitutional protections as the First Amendment right of association); Carrington v. Rash, 380 U.S. 89, 85 S. Ct. 775 (1965) (holding that the right to vote is a fundamental right protected by the Equal Protection Clause). They argue that the

56

## II. CONCLUSION

For the foregoing reasons, I would conclude that Plaintiffs have failed to

establish a substantial likelihood of success warranting federal court intervention

on either equal protection or due process grounds. The conclusion of a majority of

this court that the district court did not abuse its discretion in concluding that

Plaintiffs had failed to establish a substantial likelihood of irreparable harm, and

my conclusion in this concurring opinion that Plaintiffs have failed to establish a

---

Constitution prohibits the overbroad exercise of discretion by officials over First Amendment rights and, therefore, that Florida's statute violates the Constitution. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 129-30, 112 S. Ct. 2395, 2401 (1992) (stating that an "impermissible risk of suppression of ideas" exists where "an ordinance . . . delegates overly broad discretion to the decisionmaker").

Contrary to the Plaintiffs' argument, cases implicating First Amendment standards have involved claims that pure speech might be chilled or prevented altogether. See Forsyth County, 505 U.S. at 129-30, 112 S. Ct. at 2401; City of Jacksonville, 896 F.2d at 1285 (citing Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir. 1983) and Deerfield Med. Ctr., 661 F.2d at 338). This is not such a case. Instead, the constitutional right to vote, and the principle of equality among voters, is protected under the Equal Protection Clause of the Fourteenth Amendment. See City of Mobile v. Bolden, 446 U.S. 55, 76, 100 S. Ct. 1490, 1505 (1980)(citing Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362 (1964)). I conclude that the Florida manual recount statute satisfies equal protection because it contains constitutionally sufficient standards to constrain the discretion of canvassing board officials. I describe the statutory and judicially imposed constraints on these officials' discretion supra at 11-13. Based on these constraints, I conclude that the challenged provisions of Florida election law do not permit officials to exercise overly broad discretion over voters' rights.

I thus conclude that the Plaintiffs have failed to show a severe burden on their voting rights; instead, the statutory safeguards ensure only reasonable, nondiscriminatory burdens. I conclude that Florida's important interests in ensuring accurate, complete election results, and the state's strong interest in its established system of decentralized administration of elections, justify the reasonable, nondiscriminatory impact of Florida's manual recount statute on voters' rights. The Plaintiffs thus fail to establish a First Amendment violation.

substantial likelihood of success, are supported by the lack of evidentiary

development in this case and by the preliminary injunction posture of the case.

Especially significant in our consideration of this case is the sparse record on

which Plaintiffs have chosen to proceed.[15] The record before us is without the

benefit of discovery or evidentiary hearing. Where, as here, a party has chosen to

forego an evidentiary hearing, it is not entitled to have its disputed representations

accepted as true. See Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir.

1998). The scant evidence in this record has not been tested by the adversarial

process, notwithstanding the fact that material and relevant facts are in dispute. In

addition, the preliminary injunction posture of this case cautions against federal

court intervention. See Northeastern Fla. Chapter of Ass'n of Gen. Contractors of

Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 ("Preliminary injunctions of

legislative enactments – because they interfere with the democratic process and

lack the safeguards against abuse or error that come with a full trial on the merits –

must be granted reluctantly and only upon a clear showing that the injunction

before trial is definitely demanded by the Constitution."). I cannot conclude that

Plaintiffs on this sparse record have demonstrated a clear showing, either with

[15] We noted in our November 27, 2000, Order that Plaintiffs' motion for permanent injunctive relief has remained pending in the district court, and that court has remained available for further factual development.

58

respect to the likelihood of success or irreparable injury, and thus have not made a clear showing that an injunction before trial is definitely demanded by the Constitution.

For the foregoing reasons, I thus specially concur, in addition to joining the opinion of the court.

TJOFLAT, Circuit Judge, dissenting, in which BIRCH and DUBINA, Circuit Judges, join and in which CARNES, Circuit Judge, joins as to Part V. of Judge Tjoflat's dissent in Touchston v. McDermott:

I dissent.  The Florida election scheme at issue is unconstitutional for the reasons set forth in my dissenting opinion in Touchston v. McDermott, No. 00-15985 (11th Cir. Dec. 6, 2000) and by Judge Carnes in his dissenting opinion.

BIRCH, Circuit Judge, dissenting, in which TJOFLAT and DUBINA, Circuit Judges, join:

While I concur in the dissenting opinions by my colleagues, Judges Tjoflat, Dubina and Carnes, my concern about the constitutional deprivations alleged in these cases is focused on the lack of standards or guiding principles in the Florida manual recount statute. Florida's statutory election scheme envisions hand recounts to be an integral part of the process, providing a check when there are "error[s] in the vote tabulation which could affect the outcome of the election." *See* Fla. Stat. Ann. § 102.166(5). The 1989 Florida legislature, however, abdicated its responsibility to prescribe meaningful guidelines for ensuring that any such manual recount would be conducted fairly, accurately, and uniformly. While Florida's legislature was unquestionably vested with the power under Article II, Section One of the United States Constitution to devise its own procedures for selecting the state's electors, it was also required to ensure that whatever process it established comported with the equal protection and due process requirements of the Fourteenth Amendment to that same Constitution.[1] Other states, such as Indiana, have provided clear and definitive standards under which manual recounts

---

[1]*See Moore v. Ogilvie*, 394 U.S. 814, 818-19, 80 S.Ct. 1493, 1496 (1969) (discussing the applicability of the Fourteenth Amendment to the nominating process for presidential candidates).

61

are to be conducted. *See* Ind. Code § 3-12-1-9.5 (providing in part that chads that have been pierced count as valid votes, but those with indentations that are not separated from the ballot card do not). Absent similar clear and certain standards, Florida's manual recount scheme cannot pass constitutional muster.

Moreover, Congress, to which the electors from Florida will be ultimately certified, has established a safe harbor, 3 U.S.C. § 5, that requires that such rules and standards be established *before* the election. Because the 1989 Florida legislature has, in my view, abdicated its responsibility to formulate constitutionally clear and objective statutory rules and standards for the election process in Florida, it has disenfranchised voters throughout the state.[2] The well-intended and responsible county canvassing boards across the state have been given, in legislative terms, an unfunded mandate --- discern the voter's intent without any objective statutory instructions to accomplish that laudable goal. The effect of such an unguided, standardless, subjective evaluation of ballots to ascertain voter intent is to cause votes to be counted (or not to be counted) based only upon the disparate and unguided subjective opinion of a partisan (two

---

[2]*See* Fl. Stat. Ann. § 102.166 (West 1989). *See generally Roe v. Alabama*, 43 F.3d 574, 581-82 (11th Cir. 1995) (per curiam) (finding that the alteration of objective standards after the election disenfranchised voters).

members are elected in partisan voting) canvassing board.[3]  Since their opinions as to voter intent are standardless no meaningful judicial review is possible by a Florida court.  Accordingly, by finding an abridgement to the voters' constitutional right to vote, irreparable harm is presumed and no further showing of injury need be made.[4]

It has been said that to err is human --- and humans vote.  Thus, it should not be surprising that the voting process is subject to error.  However, as demonstrated in the recent Presidential election, the frequency, magnitude and variety of error associated with the exercise of this sacred right of citizenship is at once astounding and deeply troubling.  Morever, the media's focus on the campaign preceding

---

[3]*See* Fl. Stat. Ann. § 102.141 (providing that the County Canvassing Board shall be comprised of a county court judge, chairman of the board of county commissioners and supervisor of elections; Fl. Stat. Ann. § 124.01(2) (providing for popular election of county commissioners); Fl. Const. Art. 8, Sec. 1(d) (providing for popular election of the supervisor of elections).

[4]We have indicated that the injury suffered by a plaintiff is "'irreparable' only if it cannot be undone through monetary remedies." Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987).  To that end, we have presumed irreparable harm to a plaintiff when certain core rights are violated.  See Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1988) (irreparable harm presumed in Title VII cases); Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983) (irreparable injury presumed from violation of First Amendment rights); Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B 1981) (irreparable injury presumed from violation of right to privacy under the Fourteenth Amendment); Northeastern Florida Chapter of Ass'n of Gen. Contractors v. City of Jacksonville, Florida, 896 F.2d 1283, 1285-86 (11th Cir. 1990) (explaining that the basis for presuming irreparable injury in Cate and Deerfield was that given the "intangible nature" of the violations alleged, the plaintiffs could not effectively be compensated by an award of monetary damages). Cf. Richard Feiner & Co. v. Turner Entm't Co., 98 F.3d 33, 34 (2d Cir. 1996) (irreparable harm presumed when plaintiff establishes a prima facie case of copyright infringement).

63

November 7, having been eclipsed by its subsequent frenzy, has left the average citizen at the least skeptical, and at the worst cynical, about our democratic institutions. Morever, in its present incarnation, the post-election debacle that brings these cases to us for resolution may be cynically viewed by some as depicted by Congresswoman Shirley Chisholm:

> [P]olitics is a beautiful fraud that has been imposed on the people for years, whose practitioners exchange gilded promises for the most valuable thing their victims own: their votes. And who benefits the most? The lawyers.

Shirley Anita Chisholm, *Unbought and Unbossed*, 1970. To respond in that way would be a mistake.

While our nation's citizens have every right to be concerned, exasperated, fatigued and even cynical, it is my fervent hope that from these events they will come to understand, if not appreciate, the role of government's Third Branch in the life of our precious democracy. Our basic function in this society is to provide a forum in which disputes --- both great and small (although to those involved, a dispute is never "small") --- can be decided in an orderly, peaceful manner; and with a high level of confidence in the outcome. Lawyers, as officers of the court, are integral to that process in our adversarial system.

The right to vote --- particularly for the office of President of the United States, our Commander-In-Chief, --- is one of the most central of our fundamental

64

rights in a democracy.[5]  Accordingly, any dispute that has at its core the legitimacy

of a presidential election and impacts upon every citizen's right to vote, deserves

the most careful study, thought and wisdom that we can humanly bring to bear on

the issues entrusted to us.  Thus, I feel compelled to attest to the fact that my

brother and sister judges have embraced this case with a sense of duty, concern,

and conscientious hard work that is worthy of the issues before us.

Aware of the importance of these cases[6] and the urgency attendant to the

issues presented, we decided to take these disputes *en banc* --- that is, before the

---

[5]An executive like the President has broad discretion; he has the power to affect every voter, and thus every voter must be permitted to vote and to have his ballot both counted and equally weighed.  As the Supreme Court observed in *Anderson v. Celebrezze*, 460 U.S. 780, 794-95, 103 S. Ct. 1564, 1573 (1983) (citations omitted):

[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest.  For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation.  Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States.  Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders.  Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries.

[6]These cases have arrived at the appropriate juncture and present circumstances are of such an extraordinary scope that the "challenge to a state election rise[s] to the level of a constitutional deprivation." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986).  *See Roe*, 43 F.3d at 580, 585.  The dissent in *Roe* opined that federal courts should not interject themselves into "state election disputes unless extraordinary circumstances affecting the integrity of the state's election process are clearly present in a high degree." *Id*. at 585.  I am convinced, and surmise that the Supreme Court has concluded, that such a situation confronts us now.

65

entire court of twelve judges.[7]  Moreover, utilizing a procedure that we normally

employ in death penalty cases, we arranged through the clerks of the district courts

involved to have copies of all filings there "lodged" (i.e., copies provided) with us

contemporaneously.[8]  Hence, we have been able to review and study the progress

of the factual and legal matters presented in these cases from their inception.

Accordingly, long before the anticipated notices of appeal were filed, formally

bringing them to us, we were about the study and review of the legal issues to be

resolved.  Thus, the reader of our opinions[9] in this case should understand that our

time for consideration has been considerably longer than it might appear at first

blush.

Just as the electorate was divided in their good faith effort to cast their votes

for our nation's chief executive, the members of this court have discharged their

duty to interpret the law in the context of this case in an unbiased and sincere

effort.  Inevitably the pundits will opine that a judge's decision is somehow linked

to the political affiliation of the President that appointed the judge.  While we at all

levels of the judiciary have come to expect this observation we continue to regret

---

[7]Fed.R.App.P. 35(a)(2).

[8]11th Cir. R. 22-3.

[9]All of our opinions are available to the public on the Internet at **www.ca11.uscourts.gov**
upon publication.

that some "think" that is so. It may be true that a judge's judicial philosophy may reflect, to some degree, the philosophy of the appointing President --- not a surprising circumstance --- but to assume some sort of blind, mindless, knee-jerk response based on the politics of a judge's appointer does us and the rule of law a grave injustice. More importantly it is just wrong.

I would hope that a careful and thoughtful review of the opinions of my brothers and sisters would dispel any suggestion that their views on the important issues before us are anything but the result of days of careful study and thoughtful analysis --- because these opinions are nothing less. We have done our duty. I am proud to be associated with my judicial colleagues that have been called upon to discharge their respective constitutional obligations, albeit reluctantly --- both on this court and the many other state and federal courts involved. Indeed these recent events have been a civics lesson for some --- particularly the young; but they have also been a reminder that our nation's system of governance has weathered the test of time and tumult; the old three-legged stool[10] still stands erect and with sufficient strength to support the hopes and dreams of our nation's citizens.

---

[10]The three branches of our government, the Legislative, the Executive, and the Judicial ("The Third Branch"), have often been compared to the familiar early American three-legged stool.

The revered and quotable jurist, Learned Hand, once observed: "The spirit of liberty is the spirit which is not too sure that it is right . . ."[11]  While not "right" about many things, I am confident that we have given these matters the attention they justly deserve and trust that, at least, we have laid the groundwork for an informed decision by the justices of the United States Supreme Court should they exercise their judgment to hear this case.  It is my hope that they do.  We have done our best so that they can do their best.

---

[11]The corollary to that thought was expressed by the elder statesman from Florida, Congressman Claude Pepper: "One has the right to be wrong in a democracy."  Cong. Rec. May 27, 1946.

DUBINA, Circuit Judge, dissenting, in which TJOFLAT and BIRCH, Circuit Judges, join:

I agree with the majority's disposition of the issues of abstention, res judicata, collateral estoppel, and mootness. I also join and concur fully in the dissenting opinions filed by Judges Tjoflat, Birch, and Carnes. I dissent from the disposition of the remaining issues discussed in the majority's opinion. Specifically, I disagree with the notion that we cannot convert the preliminary injunction and reach the merits of this case. *See Thornburgh v. American College of Obstetricians & Gynecologists*, 467 U.S. 747 (1986).

As to the merits of this case, the legal principles set forth in the cases of *Moore v. Ogilvie*, 394 U.S. 814 (1969), and *Roe v. Alabama*, 43 F.3d 574 (11th Cir. 1995), govern. Based on these principles, I would reverse the judgment of the district court in this case.

CARNES, Circuit Judge, dissenting, in which TJOFLAT, BIRCH and DUBINA, Circuit Judges, join:

I agree with the Court that the lawsuits in this case and in <u>Touchston v. McDermott</u>, No. 00-15985, are not barred by the <u>Rooker-Feldman</u> doctrine or by the doctrines of res judicata, collateral estoppel, or mootness, and that there is no basis for this Court to abstain.[1] I disagree, however, with the Court's conclusion that irreparable injury has not been shown in these two cases. My disagreement with that conclusion stems from my belief that the selective manual recounts in some of the Florida counties that use the punch card system of voting violate the equal protection rights of the voters in the other punch card system counties. The harm from that violation exists and will continue so long as the results of any of those selective manual recounts are included in Florida's certified election results. Because the existence and nature of the constitutional violation is inextricably linked to the question of irreparable injury, I turn first to a discussion of the selective manual recounts in this case, and how those recounts violated the

---

[1] I address the two cases jointly in this opinion, which is appropriate in view of the similarity of issues, substantial overlap of parties, cross reference in the briefs and oral argument in each case to the other, and the district court in <u>Touchston</u>'s incorporation by reference of the reasoning of the district court's opinion in <u>Siegel</u>.

In order to avoid duplication, I will adopt in my dissenting opinion in <u>Touchston</u> what I have said here.

70

constitutional rights of the similarly situated voters who did not receive the benefit of them.

Of course, not every election dispute implicates the Constitution and justifies federal court intervention, and "[g]enerally, federal courts do not involve themselves in 'garden variety' election disputes." Roe v. Alabama, 43 F.3d 574, 580 (11th Cir. 1995) (Roe I) (quoting Curry v. Baker, 802 F.2d 1302, 1315 (11th Cir. 1986)). But this case is more than a garden variety election dispute. It concerns more than the validity of individual ballots or the administrative details of an election. This case involves part of a state's election law designed in a way that permits or even encourages infringement of the federal constitutional rights of a large category of voters, and a claim that the law was actually applied in a way that violated those rights. Federal courts have the authority and duty to address and decide such claims. That is what the Supreme Court did in Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493 (1969) (striking down as unconstitutional part of Illinois' method for selecting Presidential electors). That is what we did in the Roe cases. See Roe I, 43 F.3d at 580 (affirming preliminary injunction against counting votes that state trial court had ordered to be counted); Roe v. Alabama, 52 F.3d 300 (11th Cir. 1995) (Roe II) (same); Roe v. Alabama, 68 F.3d 404 (11th Cir. 1995) (Roe III) (same as to permanent injunction). That is what we should do in this case.

The record in this case is not replete with factual detail, but there are sufficient undisputed facts to establish a constitutional violation based upon the selective manual recounts that were undertaken in only a few punch card counties and the resulting discriminatory treatment or weighting of the votes of similarly situated voters.[2] For present purposes, I accept as fact everything represented as fact in the affidavits filed by the Democratic Party, which is the party that requested the selective manual recounts at issue in this case, and the chief party in interest on the defendants' side, and will add to them only those facts which neither party disputes. Proceeding in that manner makes it appropriate to decide the merits and whether permanent relief should be granted in these two appeals from the denials of preliminary injunctions. See Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 755 - 57, 106 S.Ct. 2169, 2176 (1986), overruled on unrelated grounds, Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791 (1992). The Thornburgh decision establishes that a court of appeals may decide

---

[2] The plaintiffs also complain about the manual recount that took place in one county, Volusia, which uses the optical scan or marksense system of voting. However, the evidence makes it abundantly clear that Volusia County was plagued with a host of problems in tabulating its vote, including outright equipment and software failures. There is no evidence that the manual recount conducted in Volusia County was done for any reason except to correct those failures and ensure that they did not taint the reported results. Nor is there any evidence in the record that any other county had an optical scan system that suffered from similar problems but for which no manual recount was ordered. The situation involving Volusia County is materially different from that involving the punch card system counties of Broward, Palm Beach, and Miami-Dade. Accordingly, I will not discuss Volusia County any further in this opinion.

the final merits of a case in an appeal from the grant or denial of a preliminary injunction if "the facts are established or of no controlling relevance," and it is not a situation "when there is no disagreement as to the law, but the probability of success on the merits depends on facts that are likely to be developed at trial." Id. at 757 & n. 8, 106 S.Ct. at 2177 & n. 8. The facts that are established or undisputed in these two cases entitle the plaintiffs to relief for reasons I will explain, and thus all disputed or undeveloped facts are of "no controlling relevance." [3]

Proceeding in this manner, the Florida Democratic Party's factual position plus the undisputed facts are these. Twenty-four of Florida's 67 counties use a vote system in which the voter's preference is expressed by punching a stylus through a card that is later passed through a tabulating machine. See Siegel, Aff. of William F. Galvin, Appendix to Brief of Florida Democratic Party ("Fla. Dem. App.") at tab 10; Chart A.[4] There are different models of punch card tabulating

---

[3] When a court of appeals decides the final legal merits of a case on an appeal from the denial of a preliminary injunction, it does not review merely for an abuse of discretion. Instead, its scope of review is plenary. See Thornburgh, at 757, 106 S.Ct. at 2176 ("The customary discretion accorded to a District Court's ruling on a preliminary injunction yields to our plenary scope of review as to the applicable law.").

[4] One of the affidavits submitted to the district court by the Florida Democratic Party states that 26 Florida counties use punch card voting systems. See Siegel, Aff. of Jon M. Ausman, Appendix to Brief of Florida Democratic Party at tab 13. According to the affidavit, that information was obtained from the Florida Secretary of State's Web Site. Id. We know now, however, based on official records provided by the Secretary of State, that only 24 Florida

machines, but all of them work by directing light at the punch card being fed through the machine and reading the beam that results from the light passing through the hole that has been punched in the card by the voter.  See Siegel, Aff. of William F. Galvin, Fla. Dem. App. at tab 10.  If the hole punched in the card is not clear of any chad, there is a possibility, perhaps a likelihood, that the tabulating machine will not count the vote.  Id.

The failure of the punch card system to count all of the intended votes is a problem inherent in that voting system.  See, e.g., Siegel, Aff. of Ion V. Sancho, Fla. Dem. App. at tab 9; Siegel, Aff. of William F. Galvin, Fla. Dem. App. at tab 10; Siegel, Aff. of Rebecca T. Mercuri, Fla. Dem. App. at tab 16.  It is a serious problem that results in a significant number of  intended votes not being counted; and those intended votes will remain uncounted unless there is a manual recount involving visual inspection of the punch cards by human beings.  See Siegel, Aff. of Jackie Winchester, Fla. Dem. App. at tab 8; Siegel, Aff. of Ion V. Sancho, Fla. Dem. App. at tab 9; Siegel, Aff. of William F. Galvin, Fla. Dem. App. at tab 10; Siegel, Aff. of Jon Ausman, Fla. Dem. App. at tab 13; Siegel, Aff. of Rebecca T. Mercuri, Fla. Dem. App. at tab 16.  While plaintiffs question  whether human beings can accurately ascertain the intent of a voter by inspecting a punch card

counties use punch card voting systems.  See Chart A.  Although the difference is not material to resolution of the legal issues, I will use the correct number, which is 24.

74

with an indented, pregnant, swinging, or otherwise not fully removed chad, the theory of the selected manual recounts undertaken in this case is that it can be done, and that as a result intended votes which would otherwise have been disregarded can and will be counted in a manual recount.

Indeed, the unwavering refrain of the Florida Democratic Party underlying its requests for manual recounts in 3 punch card counties, and throughout all of the state and federal litigation related to this case, has been that punch card systems necessarily and invariably undercount votes which can only be recaptured and considered by manual recounts. In justifying its request for manual recounts in the 3 counties, the Party told the Florida Supreme Court in a related state court case that, "It is well established that machine tabulation of votes fail (sic) to capture votes cast by a large number of voters, particularly when the number of votes cast is substantial – almost six million in the case of Florida's Presidential election. Machine tabulation of these votes, without some additional process for counting votes that the machines fail to tabulate, results in the disenfranchisement of countless voters." Answer Brief of Petitioners/Appellants Al Gore, Jr. and Florida Democratic Party at 20, Palm Beach County Canvassing Bd. v. Harris, ___ So.2d ____ (filed in the Fla. Supreme Court Nov. 19, 2000) (Nos. SC00-2346, SC00-2348 & SC00-2349); see also id. at 15 ("Underlying the addition of a provision for

75

a manual recount is an understanding that the process is <u>more</u> accurate than machine counts, not less.") (emphasis in original); <u>id</u>. at 16 ("[M]any studies indicate that machine counts of punch card ballots produce significant inaccuracies.").

In the briefs the Democratic Party filed in our court in these two cases, it has told us that:

> The optical scanner voting system used by most Florida counties provides good results, including a "non-vote" percentage for the Presidency (where one would expect "non-votes" to be very low) of only 0.40%. Punch card voting, by contrast, which is in effect in the three larger counties that have undertaken considerable manual recounts ... is much less reliable, yielding an improbable "non-vote" percentage for the Presidency of over 3%.

Brief of Intervenor/Appellee Florida Democratic Party at 23-24, <u>Touchston v. McDermott</u>, No. 00-15985 (filed in the 11th Cir. Nov. 28, 2000); <u>see also id</u>. at 10 ("Punch card ballots generate a consistently greater level of undervotes – approximately 3.2% – due to imperfect perforations and still-appended chads.").[5]

---

[5] The figures I have quoted from the Florida Democratic Party's brief were drawn by the Party from the affidavit of Jon Ausman, which the Party filed in the district court in the <u>Siegel</u> case. <u>See</u> <u>Siegel</u>, Aff. of Jon Ausman, Fla. Dem. App. at tab 13. In that affidavit, which is dated November 12, 2000, Mr. Ausman states that those figures are based upon the best data he could obtain at that time. The data was from only 18 of Florida's 67 counties – 11 punch card counties and 7 optical scan (or marksense) counties. <u>Id</u>. at paragraphs 6 - 7.

We now have complete figures from all 67 Florida counties, because the Secretary of State as part of her official duties keeps election reports that counties are required by law to submit to her. The Florida Supreme Court takes judicial notice of the contents of records kept by

The Democratic Party told the United States Supreme Court essentially the same thing: "Because of the high percentage of undervotes created by punch card voting systems, the vast majority of counties in Florida do not use them." Brief of Respondents Al Gore, Jr., and Florida Democratic Party at 4 n.2, Bush v. Palm Beach County Canvassing Bd., No. 00-836 (filed in the United States Supreme Court Nov. 28, 2000).

Summarizing its theory of the case, the Democratic Party has said: "the evidence in this case suggests that some Florida voters could potentially be disenfranchised because the automated systems utilized in some Florida counties

---

the Secretary of State, see State ex rel. Glynn v McNayr, 133 So. 2d 312, 315 (Fla. 1961), and so may we, see generally Fed. R. Evid. 201; cf. Cash Inn of Dade, Inc. v. Metropolitan Dade County, 938 F.2d 1239, 1243 (11th Cir. 1991) (minutes of a county commission meeting) ("A district court may take judicial notice of public records within its files relating to the particular case before it or other related cases.").

The complete figures for all 24 punch card counties, which are contained in Chart C in the appendix to this opinion, show a combined 3.92 % "non-vote" or "no vote" rate in those counties. The complete figures for all 41 marksense or optical scan counties, which are contained in Chart F in the appendix to this opinion, show a combined 1.43% no vote rate in those counties. (The number of punch card counties added to the number of optical scan counties equals 65 instead of 67, because one county uses a lever machine system of voting and another uses paper ballots counted by hand.).

The complete figures show us that the true difference between the no vote rates of the punch card and optical scan counties is 3.92 % minus 1.43%, or 2.49 %, and not the difference that Ausman's incomplete figures show (3.2 % minus .40 %, or 2.8%). The complete figures still show a significant difference between optical scan and punch card counties considered as a whole, but the complete figures also show that in the optical scan counties the no vote rate is not .40 %, which the Florida Democratic Party's brief tells us "is to be expected," but instead is 1.43%, or three times the Party's "expected" rate.

caused thousands of votes to go uncounted. The only means whereby those uncounted votes can be examined is to discern the intent Florida's voters is (sic) through a manual recount auditing process." Response of Intervenor/Appellee the Florida Democratic Party In Opposition to Appellants' Emergency Motion for Injunction Pending Appeal at 7, Touchston, No. 00-15985 (filed in the 11th Cir. Nov. 16, 2000). In any punch card county where manual recounts are not undertaken, the Party says, "outright disenfranchisement" occurs. See id. at 40 ("Each of the county standards employed [in the Palm Beach and Broward County manual recounts] was, thus, a vast improvement over the outright disenfranchisement that results from machine undercounts caused by hanging and dimpled chads.").

If the Florida Democratic Party's theory is not valid, then the manual recounts it requested and any change in votes resulting from those manual recounts would amount to stuffing the ballot boxes in the selected counties with illegal or non-existent votes, and counting those bogus votes would be unconstitutional for that reason. See Baker v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 705 (1962) (recognizing that the right to vote is infringed by false tally or by stuffing the ballot box); Roe I, 43 F.3d at 581. But, as I have explained, the Democratic Party insists that a manual recount actually results in the counting of intended votes that would

78

not be detected by machine, and it has put in the record numerous affidavits supporting that view.  The Florida Supreme Court seems to have embraced the theory as well by interpreting "error in the vote tabulation" in Fla. Stat. § 102.166(5) to include a discrepancy between a machine count and a sample manual recount in a punch card county.  See generally Palm Beach County Canvassing Bd. v.  Harris, ___ So.2d ___, 2000 WL 1725434, at *5-6 (Fla. Nov. 21, 2000), vacated, Bush v. Palm Beach County Canvassing Bd., 531 U.S. ___, ___ S. Ct. ___, No. 00-836 (Dec. 4, 2000) (per curiam).  Because the state high court did so, and because the theory is a necessary premise of the manual recounts the Party requested in the selected counties, I accept as a fact for present purposes the proposition that manual recounts of punch card ballots will result in intended votes being counted that otherwise would not have been if the process had stopped with machine tabulation.

If manual recounting had been conducted in all the counties using the punch card voting system so that all voters who were at risk of having their intended votes disregarded were protected to generally the same extent by the corrective process, there would be no federal constitutional violation, at least if we assume (as I will for  purposes of this analysis) that the standards applied in the recount were accurate, consistent, and fair enough to satisfy due process.  But manual recounts

did not occur in all of the punch card counties. Not by a long shot. Instead, the Florida Democratic Party requested and, in conjunction with state officials and using administrative processes sanctioned by state law, brought about a selective manual recount. The process which the Party insists corrects machine errors and ensures that the will of voters is ascertained, that voters are not disenfranchised by defective technology, was requested in only 3 of Florida's 24 counties that suffer from the punch card malady, the 3 being Broward, Palm Beach, and Miami-Dade. No recount was requested or undertaken in the remaining 21 Florida punch card counties: Collier, Desoto, Dixie, Duval, Gilchrist, Glades, Hardee, Highlands, Hillsborough, Indian River, Jefferson, Lee, Madison, Marion, Nassau, Osceola, Pasco, Pinellas, Sarasota, Sumter, and Wakulla.

The manual recounts have been completed in Broward and Palm Beach counties, and the resulting additional votes from Broward County have been added to the statewide totals. Whether part or all of any corrections brought about by the manual recounts in Palm Beach and Miami-Dade Counties will be added to the statewide totals as a result of other ongoing litigation in state court remains to be seen. Given the fluidity of events, I will assume for the remainder of this opinion that the manual recount results from all 3 of the selected counties will be added to the statewide totals. However, irrespective of what is decided in the state litigation

involving Palm Beach and Miami-Dade Counties, my conclusion remains the same because any difference in degree of selectivity between one, two, or three counties being manually recounted and the remainder of the 24 punch card counties not being recounted is immaterial under the applicable constitutional principles. The difference between one, two, or three manual recounts being conducted may affect the result of the election, but the Constitution forbids violations of voters' equal protection rights even when those violations do not change the outcome of the election. See infra at 112-113.

The voters who for whatever reason did not succeed in dislodging the chad next to their choice for President had their votes counted in Broward County and may eventually have their votes counted in the 2 other selected counties, but the voters in all of the other 21 punch card counties who applied the same pressure on the stylus and brought about the same effect, or lack of intended effect, on the chad connected with their choice for President did not have their votes counted. Under the Florida Democratic Party's theory of punch card undercounting, thousands of similarly situated Florida citizens who intended to vote for President were thwarted in their efforts by defective technology, perhaps combined with a bit of personal carelessness, and whether their intended votes count has been made to depend solely upon the county in which they live. If they live in Broward County (or

81

maybe  in Palm Beach or Miami-Dade Counties, too), their votes count; but if they live in any of the other punch card counties, they do not.  The one and only difference is in which of the 24 punch card counties they live.

"A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution from a false tally, or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box."  Baker  v. Carr, 369 U.S. 186, 208, 82 S.Ct. 691, 705 (1962) (internal citations omitted); accord Reynolds  v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378 (1964) ("And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.") (footnote omitted).

For at least a quarter of a century, it has been established that "[d]iluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race, or economic status." Reynolds, 377 at 566, 84 S.Ct. at 1384 (internal citations omitted).  As the Supreme Court explained in Reynolds, "Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there."  Id. at 563,

84 S.Ct. at 1382.  The Constitution prohibits states from weighting votes differently based on the voters' place of residence.  The Supreme Court enforced this prohibition in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801 (1963), when it struck down the county unit system the Georgia Democratic Party used in it primary elections. Under that complicated system every citizen got one vote, but in the final analysis some votes mattered more than others − they counted more − and the difference was based upon the counties in which the voter lived.  Id. at 370-72, 83 S.Ct. at 803-04.  The Court held that the Constitution prohibits such selectivity.  Id. at 380-82, 835 S.Ct. at 808-09.

Another variation on selective weighting of franchise by county of residence was presented to the Court in Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493 (1969).  That case involved an Illinois law that required a candidate seeking a place on the statewide ballot to present a nominating petition containing the signatures of at least 25,000 voters.  That basic requirement was not a constitutional problem, but a proviso that also required the nominating petition to include the signatures of 200 or more voters from each of at least 50 counties was a problem.  Id. at 815, 84 S.Ct. at 1494.  Illinois adopted that proviso in order to ensure that any candidate who got on its statewide ballot had at least minimal state-wide support, because "[a]n elected official on the state level represents all the people in the state," and

"[s]uch representatives should be aware of and concerned with the problems of the whole state and not just certain portions thereof." Moore v. Shapiro, 293 F. Supp. 411, 414 (N.D. Ill. 1968) (three-judge court), rev'd sub nom. Moore v. Ogilvie, 394 U.S. 814, 893 S.Ct. 1493 (1969). The geographic-spread proviso in Illinois' nominating petition requirement was unquestionably "an expression of rational state policy," Moore v. Shapiro, 293 F. Supp. at 414, but that did not save it from being struck down.

The problem with the Illinois proviso, the Supreme Court explained in Moore, was that it discriminated against voters residing in the more populous counties of the state in favor of those residing in the less populous counties. The constitutional math went like this:

> Under this Illinois law the electorate in 49 of the counties which contain 93.4 % of the registered voters may not form a new political party and place its candidates on the ballot. Yet 25,000 of the remaining 6.6 % of registered voters properly distributed among the 53 remaining counties may form a new party to elect candidates to office. ... It, therefore, lacks the equality to which the exercise of political rights is entitled under the Fourteenth Amendment.

Id. at 819, 89 S.Ct. at 1496. Although the selective weighting of the franchise accomplished by the proviso involved in Moore was more sophisticated and less direct, and as a result less obvious, than the laws struck down in Reynolds v. Sims,

84

it still failed to "pass muster against the charges of discrimination or of abridgement of the right to vote." Moore, 394 U.S. at 818, 89 S.Ct. at 1496.

Given the fertility of the human mind when focused upon political objectives, denial or debasement of the franchise can be accomplished in myriad ways. But whatever the method or means used to count, weigh, or value some votes differently from others, however sophisticated or indirect the device, the Constitution is up to the task. See Reynolds, 377 U.S. at 563, 84 S.Ct. at 1382 ("One must be ever aware that the Constitution forbids 'sophisticated as well as simpleminded modes of discrimination.'") (citation omitted). Because of the central importance of the right to vote in our system of representative democracy, "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized," id. at 562, 84 S.Ct. at 1381, and that is the duty of the courts.[6]

_____

[6] The Attorney General of Florida argues to us that in judging the selective manual recounts at issue in this case under the Equal Protection Clause we ought not apply strict scrutiny but, instead, should apply a lesser standard, and he cites Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059 (1992), and Fulani v. Krivanek, 973 F.2d 1539 (11th Cir. 1992), for that proposition. See Supplemental Brief of Appellee Attorney General of Florida at 4-7, Siegel, No. 00-15981 (filed in the 11th Cir. Nov. 28, 2000). However, his argument, and those citations, miss the point. Burdick and Fulani are ballot-access cases, not cases involving different treatment or weight given to votes cast. In Reynolds, which did involve different treatment of votes cast, the Supreme Court said that the proper standard was careful and meticulous scrutiny. 377 U.S. at 561-62, 84 S.Ct. at 1381.

The question is actually less one of the degree of scrutiny than it is a straightforward inquiry into whether the votes of otherwise similarly situated voters are being treated or

85

Of course, many cases dealing with sophisticated debasements of the right to vote have political overtones, and that is no less true here than usual. The Supreme Court was presented in <u>Reynolds</u> with the argument that it ought to stay its hand and keep out of the political thickets involved in that case. To that suggestion the Court responded: "Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." <u>Id</u>. at 566, 84 S.Ct. at 1384. That is a good answer.

In order to apply the principles of these decisions to the facts of the cases before us, I turn now to a closer examination of the selection of the 3 counties in which a manual recount was requested.[7] Acting pursuant to Fla. Stat. §

weighted differently because of where they live in the state. If that occurs, then there is a violation of the equal protection rights of the voter even if there is a rational purpose for the discrimination, as there was in <u>Moore v. Ogilvie</u>.

[7] There has been some discussion by the parties about full or partial manual recounts that were undertaken in at least 2 (Gadsden and Seminole) and possibly 3 (Polk) counties that use the marksense or optical scan voting system. The parties agree that those manual recounts were not requested by any candidate or political party, but were instead initiated by local canvassing boards during the period for the statewide automatic machine recount undertaken pursuant to Florida law. The circumstances relating to those recounts and any problem that may have led to them are unknown in large part because neither of these two cases contains a claim or counterclaim concerning those recounts, and the canvassing boards involved are not parties to either lawsuit.

Those recounts do not affect my analysis because they occurred in optical scan counties, were not conducted at the request of a political party or candidate, and may have been undertaken as a result of local problems, as was the case with Volusia County, which also uses the optical scan system. <u>See supra</u> n.2. In any event, even if there were unconstitutional selectivity in the choice of those 3 optical scan counties, that would not lessen the violation of the Equal Protection Clause that occurred when the Florida Democratic Party selected 3 of the 24 punch card counties for manual recounts.

86

102.166(4), the Democratic Party filed written requests for manual recounts in Broward, Palm Beach, and Miami-Dade Counties, and no other punch card counties. Siegel, Fla. Dem. App. at tabs 1, 3 & 5. There were two common grounds stated in each of those 3 written requests. One ground given in all 3 requests was that the punch card system with its chads created a risk that intended votes had not been counted ("undervotes") or actually did result in undervotes, a problem the requests said could be corrected by a manual recount with its attendant visual inspection of the cards. The other stated ground in all 3 requests was that the election results in Florida showed that the race for President was very close. No other grounds were given in the manual recount requests.[8]  See id.

---

[8] There is one exception to that statement. The request for a manual recount in Palm Beach County contained another ground. It was stated in the Palm Beach recount request that the particular configuration of the ballot in that county (the so-called "butterfly ballot") had confused Palm Beach's voters, producing two bad results: a substantial number of votes were disregarded because more than one choice was punched in the presidential race; and some voters may have inadvertently voted for someone other than their true choice. See Siegel, Fla. Dem. App. at tab 1.

That problem cannot explain or justify why the Democratic Party selected the 3 punch card counties that it did. First, neither Broward or Miami-Dade Counties used a butterfly ballot, and there was no voter confusion reported in the request for manual recounts filed in either of those counties. Second, the purpose of a manual recount in a punch card county is to find intended votes that the tabulating machine did not pick up because a chad was not sufficiently punched out. Any ballot in which the tabulating machine picked up two votes cast for the same office would be one in which the voter had cleanly punched out not one but two chads, or the machine would not have read it as two votes. Instead of helping cure that "overvote" problem, a manual recount searching for additional votes in the form of dimpled, pregnant, or swinging chads not picked up by the tabulating machine could only aggravate the problem. That is precisely the concern that the Horowitz intervenors, a group of Palm Beach voters who supported the Democratic Party's nominee in the election, expressed in the district court. See

87

The problem with machine tabulating of punch card ballots is common to counties that use the punch card system. The Democratic Party has never contended to the contrary, but instead has insisted that the problem is inherent in punch card technology.  For that reason, the existence of a punch card voting system cannot be a basis for differentiating the 3 counties that were selected from the 21 that were not.  And, of course, the fact that the statewide totals in the race for President were extremely close was a common fact, and therefore could have served as grounds for a recount in any of the other 21 punch card counties. There is nothing in the reasons that the Party gave for requesting a manual recount in the  3 selected counties that explains, let alone justifies, the discrimination in favor of those 3 punch card counties and against the other 21.  In order to give the Party the benefit of the doubt and to consider all the possibilities, I will now look elsewhere for an explanation.

Charts A - F, which are attached as appendices to this opinion, contain population and other demographic data, as well as relevant vote data on a county-

Siegel, Hearing Trans. at 108.

As to the Palm Beach voters who allegedly inadvertently voted for the wrong candidate because they were confused, a visual inspection of a punch card ballot showing a hole clear enough for the tabulating machine to have picked it up could not reveal whether at the time the hole was  punched the person doing the punching thought it would count as a vote for another candidate.

by-county basis.[9] That vote data represents things as they stood on November 9, 2000, after the automatic machine recount required under Fla. Stat. § 102.141(4) had been conducted. That is the relevant vote data for our purposes, because it reflects the facts as of the time the Florida Democratic Party filed its manual recount requests in Broward, Miami-Dade, and Palm Beach Counties on November 9, 2000.

Chart A shows that the 3 counties selected by the Democratic Party for a manual recount share these characteristics: 1) they are the 3 most populous counties in the State of Florida; 2) they are the 3 counties in which the Party's nominee, Vice-President Al Gore, received the largest number of votes; and 3) in each of them he received substantially more votes than his opponent, Governor Bush.

The theory underlying the manual recount, as I have already explained, has always been that the punch card system of voting necessarily and inevitably results in some intended votes not being picked up by the tabulating machine. The Florida Democratic Party has never suggested that its selection of counties for manual recounts was based upon any county-by-county variation in either the way the punch card system operates or in its rate of accuracy. Instead, the consistent

---

[9] We can take judicial notice of that vote data, which is from the records the Florida Secretary of State keeps as required by law and pursuant to her official duties. See supra n.5.

position of the Party, which is generally supported by the affidavits it submitted in the district court, is that every time the punch card system is used there will be intended votes that are not counted by the tabulating machine. See supra at 72-77. Given the stated justification that the manual recounts were necessary in Broward, Miami-Dade, and Palm Beach Counties because those counties used the punch card system, the more relevant focus is on the population and voting data from all of Florida's 24 punch card counties. Chart B shows that data. Of course, because the 24 punch card counties are a subset of all of Florida's 67 counties, the characteristics that distinguish the 3 counties chosen by the Party on a statewide basis also distinguish them in relation to the other 21 punch card counties: those 3 are the most populous and vote-rich of all the punch-card counties, and in each of them the Party's nominee received substantially more votes than his principal opponent.

Not only that, but we also see from the data contained in Chart B another conspicuous fact. The 3 counties the Florida Democratic Party selected for manual recounts are 3 of the 4 punch-card counties that gave its nominee the highest percentage of the vote cast among the two opposing Presidential candidates. Those percentages are as follows: Broward (68.55%); Palm Beach (63.81%); and Miami-Dade (53.18%). No other punch card county gave the Party's nominee a greater

90

percentage of its vote than Broward and Palm Beach Counties, and only one punch card county gave the Party's nominee a greater percentage of its vote than Miami-Dade County did. That lone exception is sparsely populated Jefferson County which, although favoring the Party's nominee with 55.10 % of its vote, cast a total of only 5,519 votes for the nominees of both major parties (compared, for example, to the 618,335 votes cast for them in Miami-Dade County). Because so few votes were cast in Jefferson County, that county offered little prospect for finding enough uncounted votes to make a difference. In effect, the voters of Jefferson County were too few in number to matter in view of the Party's objective, which was to change the election result that had been reported to that date.

Given the theory of the recount – finding intended votes that were not counted by the punch card system – the most relevant data of all would be the percentage of votes that were intended but not counted. We do not have that, but neither did the Florida Democratic Party when it selected the punch card counties in which to request recounts. We do have the "no vote" data, which shows the difference between the total number of voters who cast a ballot and the total votes cast for any Presidential candidate. In other words, the no vote data shows the number of ballots in which no vote for President was counted either because the tabulating machine did not pick up from the punch card any vote for President, or

because it picked up two or more votes for President on the same card resulting in no vote for President being counted.

Chart C ranks the punch card counties by percentage of no votes in the Presidential race. If Palm Beach, Miami-Dade, and Broward Counties had been selected for manual recounts because of problems resulting in no vote for President being picked up by the tabulating machines, those 3 counties would have the highest no vote rates. They do not. Chart C shows that there are 7 punch card counties with a higher percentage of no votes in the Presidential race than Palm Beach County, yet none of them was selected for manual recounts. The chart also shows that 10 punch card counties have a higher percentage of no votes than Miami-Dade County, but none of them was selected for a manual recount. And as for Broward County, there were 17 punch card counties with a higher no vote rate that were not selected for manual recounts. In fact, Broward is tied for the fourth smallest percentage of no votes for President among all of the 24 punch card counties, yet the Florida Democratic Party still selected it for a manual recount.

One of the many affidavits the Florida Democratic Party submitted in the district court stated that "two groups of citizens, the elderly and minorities, are more prone to have problems on this system than the rest of the population." Siegel, Aff. of Ion V. Sancho, Fla. Dem. App. at tab 9. Perhaps that opinion rests

upon derogatory stereotypes that federal courts should not countenance. Even assuming, however, that there is some factual basis for that opinion and that we should consider the possibility, the problems that any group, including the elderly and minorities, have with punch card voting should be captured to some extent in the no vote data contained in Chart C. But as we have seen, the Party's selection of the 3 counties cannot be justified on the basis of that data.

Moreover, Chart D, which ranks the punch card counties by percentage of population over the age of 65, shows that 7 of those counties that were not selected for manual recounts have a greater percentage of their population in that age category than Palm Beach County does; 11 not selected for manual recounts have a greater percentage in that age category than Broward County does; and 13 of them have a greater percentage in that age category than Miami-Dade County does. The Florida Democratic Party's selection of punch card counties for manual recounts could not have been based upon the percentage of elderly in each county's population.

As for "minorities" having more problems with punch card voting, it is unclear exactly what the Florida Democratic Party's affiant meant by "minorities." Chart E shows that if he meant to include both blacks and Hispanics in that grouping, Miami-Dade County's population does have a higher percentage of

minorities than any other punch card county. But the chart also shows that 6 punch card counties that were not selected for manual recounts have a higher percentage of minorities in their populations than Broward County, which was selected. And it shows that 8 punch card counties that were not selected for manual recounts have a higher percentage of minorities in their population than Palm Beach County which was also selected.

So, the facts we have about the Florida Democratic Party's selection of the counties in which a manual recount would be undertaken in order to ensure that voters were not disenfranchised by systemic problems with punch card technology or by carelessness, are these. The selection was not based upon the rate of punch card error – the no vote rate – nor was it based upon the relative percentage of senior citizens or minorities in each county's population. Instead, the defining characteristic of the 3 punch card counties chosen to undertake a manual recount is that they are the 3 most populous counties in the state, all of which gave the Party's Presidential nominee a higher percentage of the vote than his opponent.

Of course, none of this is surprising. We expect political parties to act in their own best political interest, and the 3 most populous counties that had voted for its nominee presented the Florida Democratic Party with its best prospects for turning the election around. It would not have served the Party's goal of electing

its nominee for President for it to have sought the intended but unsuccessful votes in those punch card counties that went for the other party's nominee, Governor George W. Bush. The voters in 17 of the 24 punch card counties favored Governor Bush. See Chart B. Examples include Hillsborough County (51.6 % of its 350,317 Bush/Gore votes went for Bush) and Collier County (66.89 % of its 90,351 Bush/Gore votes went for Bush). Id. Making sure that every intended vote was counted in those 17 counties that favored Bush over Gore, over two-thirds of the total number of punch card counties, was not the way for the Florida Democratic Party to get its candidate elected.

Nor would it have been efficient for the Florida Democratic Party to expend its manual recount efforts in vote-poor counties like Jefferson, whose voters did express a pronounced preference for the Party's nominee. Loyal Democrats though they may be, the citizens of Jefferson County suffered from the misfortune of living in a county whose population was so small that the total votes it cast for the two principal candidates for President were only 1.31 % of those cast in Palm Beach County, only .98 % of those cast in Broward County, and only .89 % of those cast in Miami-Dade County. That is too few to have mattered when it came to the Party's goal of changing the results of the statewide election.

There may have been  another factor at work in the Florida Democratic Party's selection of the 3 most populous counties as the ones in which to request a manual recount.  State law encourages, if not requires, manual recount choices to favor counties with greater vote totals over those with lesser vote totals. Under the statute, once a sample recount of at least 3 precincts and 1 percent of the votes cast in the county  has been conducted, the county canvassing board can manually recount all the ballots only "[i]f the manual recount [sample] indicates an error in the vote tabulation which could affect the outcome of the election."  Fla. Stat. § 102.166(5).  Of course, the larger the number of votes in a county the greater the likelihood that a complete manual recount in that county alone will affect the election, and under § 102.166(5) that appears to be the measuring rod for undertaking a complete manual recount.  Because the number of votes obviously varies in relation to a county's population, there is a greater likelihood that a complete manual recount in a more populous county will change the election result.  Since the possibility of a different statewide result appears to be a prerequisite for a complete manual recount in a county, the statute encourages and, in some cases –  where the pre-manual recount statewide difference in votes is larger than the votes that could be picked up by a full manual recount in a less populated county – may require discrimination against less-populous counties.

96

Consider the present case.  After the statewide machine recount mandated by Florida law, the statewide difference between the two Presidential candidates was 300 votes.  It would be far easier for the Florida Democratic Party to show that that margin could be erased by a manual  recount in heavily populated Miami-Dade County, which had reported a total of  618,335  votes for the two candidates, than it would be for the Party  to show the same thing in sparsely populated Jefferson County, where only 5,519 votes were cast for the two candidates.  In fact, depending upon the initial margin of victory, it could well be impossible to get a complete manual recount in many of the punch card counties, regardless of which candidate the voters in that county favored.[10]

It may be that the Florida Democratic Party would have chosen the 3 punch card counties it did even without the requirement in Fla. Stat. § 102.166(5) that the sample recount conducted in each county show that the outcome of the election

---

[10]  The discrimination that results from making a manual recount dependent upon whether the recount difference in the county could change the statewide result can also be illustrated by a fairly simple hypothetical. Suppose the statewide difference was Bush over Gore by 300 votes, and a sample manual recount showed that a full recount in Miami-Dade would probably result in a net gain for Gore of 400 votes. Suppose further that in each of the 17 punch card counties that voted for Bush over Gore a sample manual recount showed that conducting a full manual recount would result in net gains for Bush of 25 to 100 votes in each of those 17 counties for a combined total net gain of 900 votes for Bush.  As Fla. Stat. § 102.166(5) is written, it appears that complete manual recounts could not occur in those 17 less-populated counties, because the projected change in none of them, standing alone, would be enough to alter the statewide result, even though the combined total of their projected changes would have swung the election result back to Bush.

could be changed by continuing the recount in that county. Somewhat to its credit, the Party has never denied (at least not in federal court during litigation of these two cases) that it chose for manual recounts the 3 counties that it did, and not others, because those counties are populous, i.e., vote rich, and their voters had expressed a preference for its Presidential nominee. In our Court alone, the Party filed over 180 pages of briefs and used more than 40 minutes of oral argument time to explain its position. Never once in its briefs or in its oral arguments did the Party suggest that its selection of the 3 punch card counties out of 24 for a manual recount was based on anything other than partisan self-interest. That the Democratic Party predictably acted in its own best interests in using the state law recount machinery to ensure that intended votes which would otherwise be disregarded would only be counted in counties favoring its candidate does not end the inquiry. There is the matter of the Constitution.

When a political party uses state machinery and exercises prerogatives it is given under state law to influence the counting or alter the effect of votes, it is a state actor subject to the same constitutional constraints that protect citizens from the state and its officials. See Terry v. Adams, 345 U.S. 461, 481, 73 S.Ct. 809, 819 (1953) (white primary case) ("[A]ny part of the machinery for choosing officials becomes subject to the Constitution's restraints.") (citations and

98

quotations omitted). The manual recount provision contained in Fla. Stat. § 102.166(4), and the selectivity it encourages or permits political parties to exercise in bringing about recounts, is an integral part of the election process in Florida, as we have seen in recent days, and the Supreme Court has held that "[a]ll procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgement of the right to vote." Moore v. Ogilvie, 394 U.S. 814, 818, 89 S.Ct. 1493, 1495 - 96 (1969).

The Florida manual recount statute gives government officials some discretion over whether to conduct a manual recount, see Fla. Stat. § 102.166(4)(c) ("The county canvassing board may authorize a manual recount"), and government officials are intimately involved in the actual recount procedure itself. Those two facts reinforce the conclusion that the Florida Democratic Party's selection of the counties in which manual recounts could occur is state action subject to constitutional scrutiny. See Dennis v. Sparks, 449 U.S. 24, 27 - 28, 101 S.Ct. 183, 186 (1980) ("[T]o act 'under color of state law' for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action are acting . . . 'under color' of law for purposes of § 1983 actions.") (citation omitted); Gray v. Sanders, 372 U.S.

368, 374 - 75, 83 S.Ct. 801, 805 (1963) ("We agree with that result and conclude that state regulation of this preliminary phase of the election process makes it state action.") (citation omitted). What the State of Florida and its officials cannot constitutionally do alone, the State and the Florida Democratic Party acting jointly cannot do either.

If Florida enacted a statute that provided a manual recount procedure for correcting the undervote caused by the use of the punch card voting system, but provided that the corrective procedure could be invoked only in the 3 most populous counties of the state, no one would question that such a provision would be unconstitutional.[11]  And it would be unconstitutional no matter how rational the purpose of the statute.  Suppose, for example, that the state thought it was more efficient to conduct manual recounts in the really big punch card counties, and not worth the effort to do it in any little, sparsely populated, or vote-poor punch card counties.  I hope that no judge on this Court would suggest such a law would be constitutionally permissible.

---

[11]  The hypothetical statute is not far removed from the statute that Florida does have.  As I have previously pointed out, the statute appears to permit a full manual recount only if the sample recount indicates that a full recount in that county could affect the election result. Fla. Stat. § 102.166(5) (the county canvassing board can manually recount all the ballots only "[i]f the manual recount [sample] indicates an error in the vote tabulation which could affect the outcome of the election"). Because of that apparent requirement, the statute  encourages in every case, and may require in some cases,  that the manual recounts be requested in more populous, vote-rich counties.

100

The reason we would or should be unanimous in holding such a law unconstitutional is that states cannot treat votes differently depending upon the counties in which the voters live. The constitutional wrong in that hypothetical case and in the present case is the mirror image of the one in <u>Moore v. Ogilvie</u>, 394 U.S. 814, 89 S.Ct. 1493 (1969). Just as the Constitution forbids a state from counting or weighting votes less because they come from more populated counties, it also forbids a state from counting or weighting votes less because they come from more sparsely populated counties. Yet that is precisely what the manual recounts in the 3 selected Florida counties does.

Recall that the central fact underlying the theory behind the manual recounts in Broward, Palm Beach, and Miami-Dade Counties is that the punch card system of voting necessarily and inevitably results in some intended votes not being counted unless there is a manual recount. <u>See</u> <u>supra</u> at 72-77. With the selective manual recounts that the Florida Democratic Party and government officials have jointly brought about, voters are treated differently depending upon where they live. There are two sets of punch card voters whose efforts to vote are not picked up by the tabulating machines. One set, the favored one, lives in Broward, Palm Beach, and Miami-Dade Counties. The second set has the misfortune to live in the other 21 punch card counties. The votes of the first set count; the votes of the

101

second set do not. Two voters using the same effort to press an identical stylus against a punch card and bringing about the identical effect on a chad next to a Presidential candidate are treated differently. See O'Brien v. Skinner, 414 U.S. 524, 529, 94 S.Ct. 740, 743 (1974) (holding unconstitutional a statute under which two citizens "sitting side by side in the same cell may receive different treatment as to voting rights"). One vote is counted, the other not. The sole reason is that the Florida Democratic Party, acting with the authority given to it by the state, and pursuing its own political interests, chose to have one vote counted and the other not.

The matter was aptly put in a letter Florida Attorney General Robert Butterworth wrote to the Chair of the Palm Beach County Canvassing Board on November 14, 2000. The letter referred to the "extremely serious" legal issues that would arise if manual recounts were conducted in some counties but not others. He said that "a two-tier system for reporting votes would result," and:

> A two-tier system would have the effect of treating voters
> differently, depending upon what county they voted in.
> A voter in a county where a manual count was conducted
> would benefit from having a better chance of having his
> or her vote actually counted than a voter in a county
> where a hand count was halted.

Touchston, Hearing, Ex., Trans. at 9-16, 44-45 & 48. That is exactly the situation resulting from the Florida Democratic Party and Florida's state or local officials

102

acting jointly to manually recount votes in only 3 of the 24 punch card counties. In that letter, Attorney General Butterworth went on to say that he felt "a duty to warn that if the final certified total for balloting in the State of Florida includes figures generated from this two-tier system of differing behavior by official canvassing boards, the State will incur a legal jeopardy, under both the U.S. and state constitutions." That "legal jeopardy" under the United States Constitution is what this litigation is about.[12]

---

[12] Butterworth, who is the co-chair of the Florida campaign for the Democratic nominee for President, see Touchston, Hearing Trans. at 10, wrote the letter and an attached advisory opinion in order to persuade Palm Beach County to manually recount its punch card ballots. The letter referred to the possibility that Seminole County, which did not use the punch card system, had manually recounted its ballots. The Florida Democratic Party represented to us, however, that the optical scan or marksense system of voting, which is what Seminole County uses, see Chart A, "provides good results" and a no-vote percentage that one would expect to occur naturally, see Brief of Intervenor/Appellee Florida Democratic Party at 23-24, Touchston v. McDermott, No. 00-15985 (filed in the 11th Cir. Nov. 28, 2000). The Party says that system is not plagued by the same problems as the punch card system used in Palm Beach and the 23 other counties.

If manually recounting in one county that does not have a punch card system results in "legal jeopardy" because voters are being treated differently in that county from voters in punch card counties, then conducting manual recounts in only a few of the punch card counties also treats similarly situated voters in the punch card counties differently, and results in "legal jeopardy."

The Butterworth letter does speak of the different treatment being a result of "differing behavior of official canvassing boards," but it was the Florida Democratic Party that chose which county canvassing boards could undertake a manual recount pursuant to Fla. Stat. § 102.166(4). And, as I have already explained, Supreme Court precedent establishes that in choosing those counties, the Party was engaged in state action, and could not do what the Constitution forbids government officials from doing.

103

If we accept what the Florida Democratic Party has told us, we can even put an estimate on the number of affected voters who are being discriminated against in the manual recount: the number who tried to vote for a Presidential candidate but were prevented from doing so by the punch card system and for whom no effort is being made to ascertain their true intent. The Party says that the optical scanner system used in most Florida counties provides good results and the undervote in counties using that system is only .40 %, which the Party says is about what we should expect to occur naturally, i.e., by virtue of voter intent, in a Presidential election in Florida. Brief of Intervenor/Appellee Florida Democratic Party at 23-24, Touchston v. McDermott, No. 00-15985 (filed in the 11th Cir. Nov. 28, 2000). Yet the undervote in punch card counties, the Party says, is approximately 3.2%. Id. at 10. Thus, the difference in the undervote rate caused by the punch card system, if we accept the Party's figures, is approximately 2.8% . The total number of ballots cast in the 21 punch card counties in which no manual recount is being conducted is 2,013,666. See Chart C.

Applying the Party-supplied machine-caused-undervote rate of 2.8% to that figure gives us an estimated 56,382 voters in the non-selected punch card counties who tried to cast their votes but were thwarted by chad problems of one kind or

another.[13]  It is those more than 56,000 voters whom the Florida Democratic Party, in conjunction with the state, is discriminating against in its selective manual recount. Unlike their similarly situated fellow citizens in the 3 most populous counties, no effort is being made to ascertain their true intent – thereby re-enfranchising those whose attempts to vote were thwarted by defects in the technology – by manually inspecting their punch card ballots.   As the Supreme Court held in Reynolds  v. Sims, "[w]eighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable. One must be ever aware that the Constitution forbids 'sophisticated as well as simpleminded modes of discrimination.' "  377 U.S. at 563, 84 S.Ct. at 1382 (citations omitted).

The same analysis applies and the same conclusion is reached , of course, if one views the selection factor as  being not the population of the counties but instead  the number or percentage of votes cast for the Florida Democratic Party's

---

[13]  As I have already pointed out, the Florida Democratic Party's estimated 2.8 % undervote difference between the optical scan and punch card counties was based upon incomplete data, and we now know from complete data that the difference in "no vote" rates  is actually 2.49 %. See supra n.5.  However, if the results from Broward, Miami-Dade, and Palm Beach Counties are excluded, then the rate of no vote in the remaining 21 punch card counties drops from 3.92% to 3.62%.  See supra n.5 & Chart C.  When the marksense or optical scan no vote rate of 1.43% is subtracted, see Chart F, the resulting difference in no vote rates between the remaining punch card counties and the optical scan counties is 2.19%.  Applying that rate to the number of ballots cast in the remaining 21 punch card counties indicates that if the Party's central theory is correct, there are 44,099 voters in those 21 counties whose  intended vote for President was not counted.

nominee in the counties (both factors coincided here).   Just as a state, and a political party acting in conjunction with the state, cannot discriminate among voters based upon the population of their counties, so also they may not discriminate among voters based upon political opinions and beliefs as expressed by the candidates for whom those voters cast their ballots. Shifting the focus of the selection from population to political preference simply adds the weight of the First Amendment to that of the Equal Protection Clause in prohibiting the selectivity. Either way there is unconstitutional discrimination against the voters in the punch card counties not selected for manual recounts.  "Their right to vote is simply not the same right to vote as that of those living in a favored part of the State." Reynolds, 377 U.S. at 563, 84 S.Ct. at 1382.

In the face of the constitutional command that votes be treated and weighted the same regardless of where the voter lives within a state, various of the defendants respond with several arguments. One thing they argue is  that states are due  deference in the way they run elections and, in light of Article II, § 1, cl. 2 of the Constitution, and 3 U.S.C. § 5, states are due special deference when it comes to the selection of electors. But states are due no deference if they go about selecting electors in a way that violates specific provisions of the Constitution, including the Equal Protection Clause.  The Supreme Court has expressly held that

the power that Article II gives the states to select electors cannot be exercised in a way that violates the Equal Protection Clause. See Williams v. Rhodes, 393 U.S. 23, 29, 89 S.Ct. 5, 9 - 10 (1968) ("Nor can it be thought that the power to select electors could be exercised in such a way as to violate express constitutional commands that specifically bar States from passing certain kinds of laws. ... We therefore hold that no State can pass a law regulating elections that violates the Fourteenth Amendment's command that 'No State shall ... deny to any person ... the equal protection of the laws.'"); accord, Anderson v. Celebreezze, 460 U.S. 780, 795 n.18, 103 S.Ct. 1564, 1573 n.18 (1983). After all, Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493 (1969), applied the one person, one vote doctrine to strike down an Illinois statute in a case involving the selection of electors. The issue is not about Article II or 3 U.S.C. § 5; it is about whether the selective manual recounts in question violate the Constitution. Because they do, nothing in Article II and certainly nothing in any federal statute insulate that unconstitutional action from remedy.[14]

---

[14] Some of the defendants seek cover from Roudebush v. Hartke, 405 U.S. 15, 92 S.Ct. 804 (1972), but it does not provide any for them. That decision did not address the equal protection rights of voters, nor did it involve the discriminatory application of election laws in general or of recount laws in particular. It decided only the narrow issue of whether a recount of the ballots cast in an election for the United States Senate was a valid exercise of a state's power to prescribe the times, places, and manner of holding elections pursuant to Article I, § 4, or was instead a forbidden infringement on the power that Article I, § 5 gives the Senate to judge the qualifications of its members.

Getting closer to the merits issue, the defendants also argue that Florida law permits any political party with a candidate on the ballot, or any candidate whose name appears on the ballot, to file a written request with the county canvassing board for a manual recount. See Fla. Stat. § 102.166(4)(a). There is no equal protection problem, they say, because the Republican Party or its candidate could have requested that manual recounts be conducted in each of the punch card counties. This argument is not at all persuasive.

As I have already explained, although the Republican Party or its candidate could have requested a manual recount in any of Florida's counties, the statute permits full manual recounts in only those counties in which a sample manual recount indicates "an error in the vote tabulation which could affect the outcome of the election." Fla. Stat. § 102.166(5). Some of the punch card counties are so sparsely populated, so vote poor, that even if a manual recount had been requested and a sample recount conducted as provided in Fla. Stat. § 102.166(4)(d), the result of that sample recount would not have indicated that a full manual recount in the

---

The opinion in Roudebush does observe that Indiana, along with many other states, had found that the availability of a recount was necessary to guard against irregularity and errors in vote tabulation, and says that "[a] recount is an integral part of the Indiana electoral process and is within the ambit of the broad powers delegated to the States by Art. I, § 4." Id. at 25, 92 S.Ct. at 810 - 11. True enough, but a recount is not any more integral to the electoral process than the actual election itself, and as we have already seen, Article II, § 4 does not permit states to conduct elections in a way that violates a specific constitutional provision such as the Equal Protection Clause. It follows that states cannot conduct recounts in a way that violates that clause, either.

county could affect the outcome of the election. So, even if the Republican Party or its candidate had requested manual recounts in every punch card county, the process would still have ended up treating some punch card voters differently based upon the counties in which they lived. The Constitution forbids that.

There is a another, more fundamental flaw in the argument that treating punch card voters differently depending upon the county of their residence is permissible because the Republican Party or its candidate could have, but did not, prevent that difference in treatment. The constitutional rights involved are those of the voters in the other punch card counties. It is their votes and their constitutional rights at stake. The voters whose constitutional rights are being violated are not permitted to request a manual recount. See Fla. Stat. § 102.166(4)(a). There is no loophole in the Constitution that permits what would otherwise be an unconstitutional action to occur simply because a third party could have, but did not, prevent it from occurring. Therefore, the fact that both parties were permitted to request manual recounts does not shield the selective recounts from constitutional attack.

Another argument the defendants put forward responds to the criticism of the previous one. Florida Attorney General Butterworth, who was so concerned in his November 14, 2000 letter about the "legal jeopardy" that his state would be in

109

if there was a "two-tier" system in which manual recounts occurred in some counties but not others, a fortnight later filed a brief in this Court telling us there is nothing to worry about after all. According to Attorney General Butterworth's latest position on the subject, manual recounts can be requested or granted under Fla. Stat. 102.166(4)(a) - (c) in as selective or discriminatory a way as the human mind can imagine without running afoul of the Constitution. The reason, he says, is that although a voter cannot request a manual recount at that stage of the election process, a voter can later file an election contest and try to get the court to conduct a manual recount as part of that contest.

That argument is unpersuasive. Even assuming that Florida law provides a mechanism for individual voters to request manual recounts as part of an election contest, the practical and legal burdens imposed upon an individual who seeks to contest an election are entirely different, and far more burdensome, than those that a party or candidate must meet in order to institute an election contest. A request filed by a political party or candidate before the results are certified merely has to set out grounds for a manual recount, and the county canvassing board can grant it. Fla. Stat. § 102.166(4). An election contest, on the other hand, cannot be filed until after the last county canvassing board certifies results, see Fla. Stat. § 102.168(2), and once it does, a presumption kicks in and weighs against granting

110

any relief in the contest. Under Florida law, "elected officials are presumed to perform their duties in a proper and lawful manner in the absence of a sufficient showing to the contrary," and "there is a presumption that returns certified by election officials are presumed to be correct." Boardman v. Esteva, 323 So.2d 259, 268 (Fla. 1976) (citation omitted).

Besides, there is the problem of time. Election contests cannot be instituted until "after midnight of the date the last county canvassing board empowered to canvass the returns certifies the results of the election being contested." Fla. Stat. § 102.168 (2). That might be enough time in ordinary circumstances to file a contest, have it litigated through the trial and appellate stages of the state court system, win the right to a manual recount, have any issues arising in that manual recount be litigated to conclusion, and have the new result accepted. Maybe, but the circumstances giving rise to these cases are not ordinary. To begin with, the effective deadline in this case is not some time next year as it might be with most elections, but instead is December 12, and the drop-dead deadline is December 18, 2000. Not only that, but the Florida Supreme Court extended the time for the last county canvassing board to certify its results to the Secretary of State from 7 days after the election, the time specified in Fla. Stat. §§ 102.111 and 102.112, until November 26, 2000, which is 19 days after the election. See Harris, ___ So.2d at

111

___, 2000 WL 1725434, at \*16, vacated, Bush v. Palm Beach County Canvassing Bd., 531 U.S. ___, ___ S. Ct. ___, 2000 WL 1769093 (Dec. 4, 2000) (per curiam). That cut 12 days out of the period that would otherwise have been provided for conducting an election contest through to conclusion.

We know from the inability of Miami-Dade and Palm Beach Counties to finish the actual manual recounts in even the extended time the Florida Supreme Court allotted them, that it would have been impossible as a practical matter for a voter in, for example, Hillsborough County, a punch card county in which 369,467 ballots were cast in the Presidential election, see Chart C, to file an election contest demanding a manual recount in that county, try the case before the trial court, succeed on appeal in time for the canvassing board to conduct and complete a full manual recount, and then have any issues arising in that recount decided. An election contest under Florida law is not a practical remedy for voters who have been discriminated against in the Florida Democratic Party's selection of punch card counties in which to request a manual recount.

Even if there were enough time for such manual recounts after the extended period for the county canvassing boards to report, there is another serious obstacle to a voter using the Florida election contest procedures to secure a manual recount in that voter's county. Except in cases of outright fraud, bribery, or other

112

corruption, or the ineligibility for office of the successful candidate, Florida law requires that anyone filing an election contest show that correction of the problem complained about would change the results of the election. See Fla. Stat. § 102.168(3)(c) ("Receipt of a number of illegal votes or rejection of a number of legal votes sufficient to change or place in doubt the result of the election.") & (3)(e) ("Any other cause or allegation which, if sustained, would show that a person other than the successful candidate was the person duly nominated or elected to the office."). If the voter cannot show that the constitutional violation he suffered changed the result of the election, he has no grounds for contesting the election under the Florida election statute.

While Florida's interest in bottom line election results is certainly expedient, the Constitution demands more than expediency. It is concerned with values other than the outcome of elections. To say that it is sufficient to remedy only those constitutional violations that matter to the political parties and their candidates is to say the rights of voters themselves do not matter. Can anyone seriously suggest that the Reynolds v. Sims, Gray v. Sanders, and Moore v. Ogilvie doctrines apply only when election results would be changed? When the Supreme Court in Reynolds said, "[t]o the extent that a citizen's right to vote is debased, he is that much less a citizen," 377 U.S. at 567, 84 S.Ct at 1384, the Court did not add

"unless it makes no difference in the election results." When the Court said that "the basic principle of representative government remains, and must remain, unchanged – the weight of a citizen's vote cannot be made to depend on where he lives," id., surely the Court did not mean for that basic principle to be inapplicable except where it was outcome determinative for a candidate.

In Moore there was "absolutely no indication in the record that the appellants could not, if they had made the effort, have easily satisfied Illinois' 50-county, 200-signature requirement," see 394 U.S. at 820 - 21, 89 S. Ct. at 1497(Stewart, J., dissenting). In other words, there was absolutely no indication that the differential treatment of citizens based upon the counties in which they lived affected whether any would-be candidate could get on the ballot. Nonetheless, the Supreme Court did not hesitate to strike down the discrimination among voters, explaining that "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." Id. at 819, 89 S.Ct. at 1496. The one person, one vote principle is not so fickle as to depend upon the closeness of an election.

One last argument relating to the merits which is put forward by several of the defendants is that there is no constitutional violation in selective manual recounts based upon county of residence, because there are variations among the

114

counties in election systems and different systems give rise to different error rates. In other words, unless the Constitution mandates that every county use the same voting system, it logically cannot prohibit selective correction of error rates in counties that use the same system. But why not? Why are differences in the number of vote errors that occur as a result of local variations in choice of vote systems before an election the constitutional equivalent of selective correction of errors based upon county of residence after the election?

There is no reason to believe that any county would attempt to choose for itself a voting system with a high error rate in order to disadvantage its citizens compared to those of other counties. There is every reason to believe that political parties or candidates will selectively choose the counties in which to initiate the process of manual recounts based upon how those counties voted and their population. The intent behind the two actions is different. To understand the importance of that difference, consider this hypothetical. Suppose a state legislature mandated the type of voting systems to be used in each county, and deliberately favored urban counties with low-error systems that would keep down the undervote, while sticking rural counties with high-error systems that would increase the undervote in those counties thereby reducing their influence in statewide elections. Maybe the legislature, dominated by members from the more

populous counties, just wanted to keep the country folks in their place. Is there any doubt that such legislation would be unconstitutional under <u>Reynolds</u> and related cases? It would be unconstitutional even though the discriminatory choice occurred on the front end, before the election, and even though it involved variations in the vote systems used in different counties.

How then can it be constitutionally permissible to make a materially similar, discriminatory choice on the back end after the election: to favor the voters of more populous counties who went for one candidate with a process that ameliorates their undervote, while not applying that process to ameliorate the same or worse undervote problems in less populous counties that went for the other candidate? The answer is that it is not constitutionally permissible to discriminate in favor of the voters of Broward, Palm Beach, and Miami-Dade, or any combination of those counties, and against the voters in the other 21 punch card counties when it comes to a post-election remedy of the undervote problem caused by the voting system technology.

The Florida Supreme Court reminded us that: "Courts must not lose sight of the fundamental purpose of election laws: The laws are intended to facilitate and safeguard the right of each voter to express his or her will in the context of our representative democracy." <u>Harris</u>, ___ So.2d at ____, 2000 WL 1725434, at *13

(footnote omitted). But we also must not lose sight of the constitutional guarantee of equal protection, which prohibits states from selectively facilitating and safeguarding the rights of voters based upon where they live in the state. Florida's election laws, as applied in this case, run afoul of that prohibition.

Finally, the defendants contend that we need not even decide the merits of the constitutional claims in this case because the plaintiffs have not suffered an irreparable injury. They base that assertion on two premises. First, the defendants maintain that it is inappropriate at this juncture to decide whether permanent injunctive relief should be issued. I disagree for the reasons I have already stated. See supra at 71-72, discussing Thornburgh v. Am. Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 755-57, 106 S.Ct. 2169, 2176 - 77 (1986). Second, the defendants maintain that there is no equal protection violation unless and until the outcome of the election is altered by the inclusion of the manually recounted ballots in Florida's certified results. But, as I have already explained, the constitutional harm is inflicted when the ballots of similarly situated voters are counted and weighted differently, and that harm exists regardless of the outcome of the election.

The standard for a permanent injunction is essentially the same as for a preliminary injunction except that the plaintiff must show actual success on the

merits instead of a likelihood of success. <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n.12, 107 S.Ct. 1396, 1404 n.12 (1987). In addition to succeeding on the merits, a plaintiff must "demonstrate the presence of two elements: continuing irreparable injury if the injunction does not issue, and the lack of an adequate remedy at law." <u>Newman v. State of Ala.</u>, 683 F.2d 1312, 1319 (11th Cir. 1982). Explaining the distinction between "irreparable injury" and "adequate remedy at law," our predecessor circuit said:

> [T]he essential prerequisite to a permanent injunction is the unavailability of an adequate remedy at law. Irreparable injury is, however, one basis, and probably the major one, for showing the inadequacy of any legal remedy. . . . Often times the concepts of "irreparable injury" and "no adequate remedy at law" are indistinguishable. . . . "[T]he irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury."

<u>Lewis v. S. S. Baune</u>, 534 F.2d 1115, 1124 (5th Cir. 1976) (citations omitted).

Here, I believe that the plaintiffs in these two cases have succeeded on the merits by establishing that the disparate treatment of similarly situated voters violates the Equal Protection Clause. That constitutional injury to their right to vote is irreparable, since it "cannot be undone through monetary remedies." <u>Cunnigham v. Adams</u>, 808 F.2d 815, 821 (11th Cir. 1987), both because of the unquantifiable nature of the right to vote as well as its fundamental importance in

118

our system of representative democracy. See Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381(1964) (the right to vote is "a fundamental political right, because [it is] preservative of all rights'") (citation and quotations omitted). See also Northeastern Fla. Chapter of the Assoc. of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (discussing cases in which this Court has recognized that an on-going violation of the First Amendment or privacy rights constitutes irreparable injury, and stating that "[t]he rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated by monetary damages; in other words, plaintiffs could not be made whole").

Not surprisingly, there is no suggestion by the defendants that there is an adequate remedy at law to address the voting-rights injury presented in this case. See Dillard v. Crenshaw County, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) ("Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance."). There is an irreparable injury to the right to vote for which there is no adequate remedy at law. Accordingly, granting the requested injunctive relief is the only appropriate remedy.

# Appendices

## CHART A

## All Counties Ranked by Population

| County | Population[1] | Vote System[2] | Bush Vote[3] | Gore Vote[4] | Total Bush/ Gore Vote[5] | Gore Percentage[6] |
|---|---|---|---|---|---|---|
| **Miami-Dade** | **2175634** | **punch** | **289533** | **328802** | **618335** | **53.18%** |
| **Broward** | **1535468** | **punch** | **177323** | **386561** | **563884** | **68.55%** |
| **Palm Beach** | **1049420** | **punch** | **152951** | **269732** | **422683** | **63.81%** |
| Hillsborough | 940484 | punch | 180760 | 169557 | 350317 | 48.40% |
| Pinellas | 878499 | punch | 184823 | 200629 | 385452 | 52.05% |
| Orange | 817206 | marksense | 134517 | 140220 | 274737 | 51.04% |
| Duval | 738483 | punch | 152098 | 107864 | 259962 | 41.49% |
| Brevard | 470365 | marksense | 115185 | 97318 | 212503 | 45.80% |
| Polk | 457347 | marksense | 90295 | 75200 | 165495 | 45.44% |
| Volusia | 425601 | marksense | 82357 | 97304 | 179661 | 54.16% |
| Lee | 400542 | punch | 106141 | 73560 | 179701 | 40.93% |
| Seminole | 357390 | marksense | 75677 | 59174 | 134851 | 43.88% |
| Pasco | 330704 | punch | 68582 | 69564 | 138146 | 50.36% |
| Sarasota | 306546 | punch | 83100 | 72853 | 155953 | 46.71% |
| Escambia | 282432 | marksense | 73017 | 40943 | 113960 | 35.93% |
| Marion | 245975 | punch | 55141 | 44665 | 99806 | 44.75% |
| Manatee | 243531 | marksense | 57952 | 49177 | 107129 | 45.90% |
| Leon | 215926 | marksense | 39062 | 61427 | 100489 | 61.13% |
| Lake | 209812 | marksense | 50010 | 36571 | 86581 | 42.24% |
| Collier | 207029 | punch | 60433 | 29918 | 90351 | 33.11% |
| Alachua | 198484 | marksense | 34124 | 47365 | 81489 | 58.12% |
| St. Lucie | 181850 | marksense | 34705 | 41559 | 76264 | 54.49% |
| Okaloosa | 170049 | marksense | 52093 | 16948 | 69041 | 24.55% |
| Osceola | 150596 | punch | 26212 | 28181 | 54393 | 51.81% |
| Bay | 147958 | marksense | 38637 | 18850 | 57487 | 32.79% |
| Clay | 141353 | marksense | 41736 | 14632 | 56368 | 25.96% |
| Charlotte | 136992 | marksense | 35426 | 29645 | 65071 | 45.56% |
| Hernando | 128482 | marksense | 30646 | 32644 | 63290 | 51.58% |
| Santa Rosa | 120952 | marksense | 36274 | 12802 | 49076 | 26.09% |
| St. Johns | 119685 | marksense | 39546 | 19502 | 59048 | 33.03% |
| Martin | 118117 | lever | 33970 | 26620 | 60590 | 43.93% |
| Citrus | 116111 | marksense | 29766 | 25525 | 55291 | 46.16% |
| Indian River | 100253 | punch | 28635 | 19768 | 48403 | 40.84% |
| Monroe | 79941 | marksense | 16059 | 16483 | 32542 | 50.65% |
| Highlands | 74795 | punch | 20206 | 14167 | 34373 | 41.22% |
| Putnam | 70215 | marksense | 13447 | 12102 | 25549 | 47.37% |
| Nassau | 56811 | punch | 16280 | 6879 | 23159 | 29.70% |
| Columbia | 53738 | marksense | 10964 | 7047 | 18011 | 39.13% |
| Flagler | 49110 | marksense | 12613 | 13897 | 26510 | 52.42% |
| Jackson | 44549 | marksense | 9138 | 6868 | 16006 | 42.91% |
| Gadsden | 44077 | marksense | 4767 | 9735 | 14502 | 67.13% |
| Sumter | 42754 | punch | 12127 | 9637 | 21764 | 44.28% |
| Walton | 38124 | marksense | 12182 | 5642 | 17824 | 31.65% |
| Suwanee | 32972 | marksense | 8006 | 4075 | 12081 | 33.73% |
| Levy | 32386 | marksense | 6858 | 5398 | 12256 | 44.04% |
| Okeechobee | 32386 | marksense | 5057 | 4588 | 9645 | 47.57% |
| Hendry | 29463 | marksense | 4747 | 3240 | 7987 | 40.57% |
| Bradford | 24872 | marksense | 5414 | 3075 | 8489 | 36.22% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Desoto | 24636 | punch | 4256 | 3320 | 7576 | 43.82% |
| Baker | 21181 | marksense | 5610 | 2392 | 8002 | 29.89% |
| Hardee | 21017 | punch | 3765 | 2339 | 6104 | 38.32% |
| Washington | 20614 | marksense | 4994 | 2798 | 7792 | 35.91% |
| Wakulla | 19179 | punch | 4512 | 3838 | 8350 | 45.96% |
| Taylor | 19049 | marksense | 4056 | 2649 | 6705 | 39.51% |
| Holmes | 18761 | marksense | 5011 | 2177 | 7188 | 30.29% |
| Madison | 17919 | punch | 3038 | 3014 | 6052 | 49.80% |
| Gilchrist | 14056 | punch | 3300 | 1910 | 5210 | 36.66% |
| Gulf | 13562 | marksense | 3550 | 2397 | 5947 | 40.31% |
| Jefferson | 13090 | punch | 2478 | 3041 | 5519 | 55.10% |
| Dixie | 12919 | punch | 2697 | 1826 | 4523 | 40.37% |
| Hamilton | 12785 | marksense | 2146 | 1722 | 3868 | 44.52% |
| Union | 12720 | hand count | 2332 | 1407 | 3739 | 37.63% |
| Calhoun | 12436 | marksense | 2873 | 2155 | 5028 | 42.86% |
| Franklin | 9978 | marksense | 2454 | 2046 | 4500 | 45.47% |
| Glades | 8693 | punch | 1841 | 1442 | 3283 | 43.92% |
| Liberty | 6703 | marksense | 1317 | 1017 | 2334 | 43.57% |
| Lafayette | 6477 | marksense | 1670 | 789 | 2459 | 32.09% |
| **Total** | **15111244** | | **2910492** | **2910192** | **5820684** | **50.00%** |

1.  1999 Population Estimates, Population Estimates Program, Population Div., U.S. Census Bureau, http://www.census.gov/population/estimates/county/co-99-1/99C1_12.txt

2.  "Certified Voting Systems Used in Florida, Table of Methods (by system, by county)," provided by Sec. of State from Official Records in Response to Request of Court, Nov. 30, 2000.

3.  Harris', Roberts', and Crawford's Response to Emergency Motion for Injunction Pending Appeal and to Expedite, Exhibit A; "2000 General Election Results, Unofficial (Recount Results 11/14/2000)," provided by Sec. of State from Official Records in Response to Request of Court, Nov. 30, 2000.

4.  Id.

5.  Combination of "Bush Vote" and "Gore Vote" Totals for Each County

6.  "Gore Vote" Total Divided by "Total Bush/Gore Vote" for Each County

## Punch Card Counties Ranked by Population

| County | Population[1] | Bush Vote[2] | Gore Vote[3] | Total Bush/ Gore Vote[4] | Gore Percentage[5] |
|---|---|---|---|---|---|
| **Miami-Dade** | **2175634** | **289533** | **328802** | **618335** | **53.18%** |
| **Broward** | **1535468** | **177323** | **386561** | **563884** | **68.55%** |
| **Palm Beach** | **1049420** | **152951** | **269732** | **422683** | **63.81%** |
| Hillsborough | 940484 | 180760 | 169557 | 350317 | 48.40% |
| Pinellas | 878499 | 184823 | 200629 | 385452 | 52.05% |
| Duval | 738483 | 152098 | 107864 | 259962 | 41.49% |
| Lee | 400542 | 106141 | 73560 | 179701 | 40.93% |
| Pasco | 330704 | 68582 | 69564 | 138146 | 50.36% |
| Marion | 245975 | 55141 | 44665 | 99806 | 44.75% |
| Collier | 207029 | 60433 | 29918 | 90351 | 33.11% |
| Sarasota | 306546 | 83100 | 72853 | 155953 | 46.71% |
| Osceola | 150596 | 26212 | 28181 | 54393 | 51.81% |
| Indian River | 100253 | 28635 | 19768 | 48403 | 40.84% |
| Highlands | 74795 | 20206 | 14167 | 34373 | 41.22% |
| Nassau | 56811 | 16280 | 6879 | 23159 | 29.70% |
| Sumter | 42754 | 12127 | 9637 | 21764 | 44.28% |
| Desoto | 24636 | 4256 | 3320 | 7576 | 43.82% |
| Hardee | 21017 | 3765 | 2339 | 6104 | 38.32% |
| Wakulla | 19179 | 4512 | 3838 | 8350 | 45.96% |
| Madison | 17919 | 3038 | 3014 | 6052 | 49.80% |
| Gilchrist | 14056 | 3300 | 1910 | 5210 | 36.66% |
| Jefferson | 13090 | 2478 | 3041 | 5519 | 55.10% |
| St. Johns | 306546 | 39546 | 19502 | 59048 | 33.03% |
| Dixie | 12919 | 2697 | 1826 | 4523 | 40.37% |
| Glades | 8693 | 1841 | 1442 | 3283 | 43.92% |
| **Total** | **9365502** | **1640232** | **1853067** | **3493299** | **53.05%** |

1. 1999 Population Estimates, Population Estimates Program, Population Div.,
   U.S. Census Bureau, <http://www.census.gov/population/estimates/county/co-99-1/99C1_12.txt>
2. Harris', Roberts', and Crawford's Response to Emergency Motion for Injunction Pending Appeal and to
   Expedite, Exhibit A; "2000 General Election Results, Unofficial (Recount Results 11/14/2000)," provided by
   Sec. of State from Official Records in Response to Request of Court, Nov. 30, 2000.
3. Id.
4. Combination of "Bush Vote" and "Gore Vote" Totals for Each County
5. "Gore Vote" Total Divided by "Total Bush/Gore Vote" for Each County

**CHART C**
**Punch Card Counties by Percentage of "No Vote"**

| County | Ballots Cast[1] | Presidential Votes Counted[2] | No Votes[3] | Percent No Votes[4] | Gore Share[5] |
|---|---|---|---|---|---|
| Glades | 3722 | 3365 | 357 | 9.59% | 43.92% |
| Duval | 291626 | 264636 | 26990 | 9.26% | 41.49% |
| Jefferson | 6215 | 5643 | 572 | 9.20% | 55.10% |
| Desoto | 8512 | 7811 | 701 | 8.24% | 43.82% |
| Madison | 6642 | 6162 | 480 | 7.23% | 49.80% |
| Nassau | 25387 | 23581 | 1806 | 7.11% | 29.70% |
| Dixie | 4998 | 4666 | 332 | 6.64% | 40.37% |
| **Palm Beach** | **462588** | **433186** | **29402** | **6.36%** | **63.81%** |
| Hardee | 6645 | 6233 | 412 | 6.20% | 38.32% |
| Gilchrist | 5688 | 5395 | 293 | 5.15% | 36.66% |
| Wakulla | 9017 | 8587 | 430 | 4.77% | 45.96% |
| **Miami-Dade** | **654044** | **625443** | **28601** | **4.37%** | **53.18%** |
| Indian River | 51559 | 49622 | 1937 | 3.76% | 40.84% |
| Sumter | 23032 | 22261 | 771 | 3.35% | 44.28% |
| Collier | 95325 | 92141 | 3184 | 3.34% | 33.11% |
| Osceola | 57341 | 55658 | 1683 | 2.94% | 51.81% |
| Marion | 106001 | 102956 | 3045 | 2.87% | 44.75% |
| Highlands | 36158 | 35149 | 1009 | 2.79% | 41.22% |
| Pasco | 146648 | 142731 | 3917 | 2.67% | 50.36% |
| **Broward** | **588007** | **573396** | **14611** | **2.48%** | **68.55%** |
| Hillsborough | 369467 | 360295 | 9172 | 2.48% | 48.40% |
| Lee | 188978 | 184377 | 4601 | 2.43% | 40.93% |
| Pinellas | 406956 | 398469 | 8487 | 2.09% | 52.05% |
| Sarasota | 163749 | 160942 | 2807 | 1.71% | 46.71% |
| **Total** | **3718305** | **3572705** | **145600** | **3.92%** | **53.05%** |

1. "Voter Turnout (November 15, 2000)," provided by the Sec. of State from Official Records in Response to Request of Court, November, 30, 2000.
2. Id.
3. Id.
4. Id.
5. "Gore Vote" Total Divided by "Total Bush/Gore Vote" for Each County, based on figures from Harris', Roberts', and Crawford's Response to Emergency Motion for Injunction Pending Appeal and to Expedite, Exhibit A; "2000 General Election Results, Unofficial (Recount Results 11/14/2000)," provided by Sec. of State from Official Records in Response to Request of Court, Nov. 30, 2000.

**CHART D**
**Punch Card Counties by Percentage of Citizens 65+**

| County | Population[1] | Population 65+[2] | Percent 65+[3] | Gore Share[4] |
|---|---|---|---|---|
| Highlands | 74795 | 27042 | 36.15% | 41.22% |
| Sarasota | 306546 | 98225 | 32.04% | 46.71% |
| Indian River | 100253 | 28851 | 28.78% | 40.84% |
| Pasco | 330704 | 87190 | 26.36% | 50.36% |
| Collier | 207029 | 52999 | 25.60% | 33.11% |
| Lee | 400542 | 102530 | 25.60% | 40.93% |
| Marion | 245975 | 62122 | 25.26% | 44.75% |
| **Palm Beach** | **1049420** | **253796** | **24.18%** | **63.81%** |
| Pinellas | 878499 | 203070 | 23.12% | 52.05% |
| Desoto | 24636 | 4970 | 20.17% | 43.82% |
| Glades | 8693 | 1687 | 19.41% | 43.92% |
| Sumter | 42754 | 7873 | 18.41% | 44.28% |
| **Broward** | **1535468** | **258033** | **16.80%** | **68.55%** |
| Dixie | 12919 | 2137 | 16.54% | 40.37% |
| Hardee | 21017 | 3245 | 15.44% | 38.32% |
| **Miami-Dade** | **2175634** | **310642** | **14.28%** | **53.18%** |
| Madison | 17919 | 2458 | 13.72% | 49.80% |
| Jefferson | 13090 | 1783 | 13.62% | 55.10% |
| Gilchrist | 14056 | 1894 | 13.47% | 36.66% |
| Osceola | 150596 | 20265 | 13.46% | 51.81% |
| Nassau | 56811 | 7492 | 13.19% | 29.70% |
| Hillsborough | 940484 | 119047 | 12.66% | 48.40% |
| Wakulla | 19179 | 2380 | 12.41% | 45.96% |
| Duval | 738483 | 77976 | 10.56% | 41.49% |
| **Total** | **9365502** | **1737707** | **18.55%** | **53.05%** |

1   1999 Population Estimates, Population Estimates Program, Population Div.,
    U.S. Census Bureau, <http://www.census.gov/population/estimates/county/co-99-1/99C1_12.txt

2.   "Population Estimates for Counties by Age Group: July 1, 1999," Population Estimates Program,
     Population Div., U.S. Census Bureau,
      <http://www.census.gov/population/estimates/county/ca/cafl99.txt>

3.   "Population 65+" Divided by "Population"

4.   "Gore Vote" Total Divided by "Total Bush/Gore Vote"  for Each County, based on figures from
     Harris', Roberts', and Crawford's Response to Emergency Motion for Injunction Pending Appeal and
     to Expedite, Exhibit A; "2000 General Election Results, Unofficial (Recount Results 11/14/2000),"
     provided by Sec. of State from Official Records in Reponse to Request of Court, Nov. 30, 2000.

**CHART E**

**Punch Card Counties by Percentage of Black/Hispanic**

| County | Population[1] | Total Black[2] | Total Hispanic[3] | Total Black/ Hispanic[4] | Percentage Black/Hispanic[5] | Gore Share[6] |
|---|---|---|---|---|---|---|
| **Miami-Dade** | **2175634** | **443024** | **1249358** | **1692382** | **77.79%** | **53.18%** |
| Jefferson | 13090 | 6387 | 357 | 6744 | 51.52% | 55.10% |
| Madison | 17919 | 8343 | 383 | 8726 | 48.70% | 49.80% |
| Hardee | 21017 | 1610 | 6457 | 8067 | 38.38% | 38.32% |
| Hillsborough | 940484 | 144031 | 171813 | 315844 | 33.58% | 48.40% |
| Duval | 738483 | 210757 | 28934 | 239691 | 32.46% | 41.49% |
| Desoto | 24636 | 4480 | 3311 | 7791 | 31.62% | 43.82% |
| **Broward** | **1535468** | **285918** | **196581** | **482499** | **31.42%** | **68.55%** |
| Glades | 8693 | 1476 | 1027 | 2503 | 28.79% | 43.92% |
| Sumter | 42754 | 9381 | 1866 | 11247 | 26.31% | 44.28% |
| **Palm Beach** | **1049420** | **155763** | **117114** | **272877** | **26.00%** | **63.81%** |
| Osceola | 150596 | 10320 | 26500 | 36820 | 24.45% | 51.81% |
| Collier | 207029 | 11860 | 38413 | 50273 | 24.28% | 33.11% |
| Marion | 245975 | 36550 | 11282 | 47832 | 19.45% | 44.75% |
| Highlands | 74795 | 8671 | 5554 | 14225 | 19.02% | 41.22% |
| Wakulla | 19179 | 2991 | 179 | 3170 | 16.53% | 45.96% |
| Lee | 400542 | 32270 | 27222 | 59492 | 14.85% | 40.93% |
| Indian River | 100253 | 10205 | 4463 | 14668 | 14.63% | 40.84% |
| Nassau | 56811 | 7147 | 1002 | 8149 | 14.34% | 29.70% |
| Pinellas | 878499 | 85019 | 32647 | 117666 | 13.39% | 52.05% |
| Gilchrist | 14056 | 1302 | 332 | 1634 | 11.62% | 36.66% |
| Dixie | 12919 | 1216 | 179 | 1395 | 10.80% | 40.37% |
| Sarasota | 306546 | 16386 | 10039 | 26425 | 8.62% | 46.71% |
| Pasco | 330704 | 8494 | 18013 | 26507 | 8.02% | 50.36% |
| **Total** | **9365502** | **1503601** | **1953026** | **1204826** | **12.86%** | **53.05%** |

1. 1999 Population Estimates, Population Estimates Program, Population Div., U.S. Census Bureau, <http://www.census.gov/population/estimates/county/co-99-1/99C1_12.txt>

2. "Population Estimates for Counties by Race and Hispanic Origin: July 1, 1999," Population Estimates Program, Population Div., U.S. Census Bureau, <http://www.census.gov/population/estimates/county/crh/crhfl99.txt>

3. Id.

4. Combination of "Total Black" and "Total Hispanic"

5. "Total Black/Hispanic" Divided by "Population"

6. "Gore Vote" Total Divided by "Total Bush/Gore Vote" for Each County, based on figures from Harris', Roberts', and Crawford's Response to Emergency Motion for Injunction Pending Appeal and to Expedite, Exhibit A; "2000 General Election Results, Unofficial (Recount Results 11/14/2000)," provided by Sec. of State from Official Records in Response to Request of Court, Nov. 30, 2000.

# CHART F

## Marksense (Optical Scan) Counties by Percentage of "No Votes"

| County | Population[1] | Ballots Cast[2] | Presidential Votes Counted[3] | No Votes[4] | Percent No Votes[5] | Gore Share[6] |
|---|---|---|---|---|---|---|
| Gadsden | 44077 | 16812 | 14727 | 2085 | 12.40% | 67.13% |
| Hendry | 29463 | 8950 | 8139 | 811 | 9.06% | 40.57% |
| Hamilton | 12785 | 4353 | 3964 | 389 | 8.94% | 44.52% |
| Franklin | 9978 | 5070 | 4644 | 426 | 8.40% | 45.47% |
| Taylor | 19049 | 7413 | 6808 | 605 | 8.16% | 39.51% |
| Okeechobee | 32386 | 10722 | 9853 | 869 | 8.10% | 47.57% |
| Bradford | 24872 | 9414 | 8673 | 741 | 7.87% | 36.22% |
| Liberty | 6703 | 2598 | 2410 | 188 | 7.24% | 43.57% |
| Jackson | 44549 | 17470 | 16300 | 1170 | 6.70% | 42.91% |
| Lafayette | 6477 | 2679 | 2505 | 174 | 6.49% | 32.09% |
| Levy | 32386 | 13490 | 12724 | 766 | 5.68% | 44.04% |
| Suwanee | 32972 | 13189 | 12457 | 732 | 5.55% | 33.73% |
| Charlotte | 136992 | 70100 | 66896 | 3204 | 4.57% | 45.56% |
| Washington | 20614 | 8353 | 8025 | 328 | 3.93% | 35.91% |
| Lake | 209812 | 92046 | 88611 | 3435 | 3.73% | 42.24% |
| Escambia | 282432 | 121141 | 116648 | 4493 | 3.71% | 35.93% |
| Columbia | 53738 | 19206 | 18508 | 698 | 3.63% | 39.13% |
| Holmes | 18761 | 7541 | 7395 | 146 | 1.94% | 30.29% |
| Baker | 21181 | 8300 | 8154 | 146 | 1.76% | 29.89% |
| Calhoun | 12436 | 5256 | 5174 | 82 | 1.56% | 42.86% |
| Manatee | 243531 | 111676 | 110221 | 1455 | 1.30% | 45.90% |
| Bay | 147958 | 59520 | 58805 | 715 | 1.20% | 32.79% |
| Walton | 38124 | 18537 | 18318 | 219 | 1.18% | 31.65% |
| Okaloosa | 170049 | 71512 | 70680 | 832 | 1.16% | 24.55% |
| St. Johns | 119685 | 61313 | 60746 | 567 | 0.92% | 33.03% |
| St. Lucie | 181850 | 78709 | 77989 | 720 | 0.91% | 54.49% |
| Orange | 817206 | 282529 | 280125 | 2404 | 0.85% | 51.04% |
| Putnam | 70215 | 26416 | 26222 | 194 | 0.73% | 47.37% |
| Santa Rosa | 120952 | 50684 | 50319 | 365 | 0.72% | 26.09% |
| Clay | 141353 | 57764 | 57353 | 411 | 0.71% | 25.96% |
| Monroe | 79941 | 34095 | 33887 | 208 | 0.61% | 50.65% |
| Union | 12720 | 4084 | 3826 | 258 | 6.32% | 37.63% |
| Polk | 457347 | 169582 | 168607 | 975 | 0.57% | 45.44% |
| Alachua | 198484 | 86144 | 85729 | 415 | 0.48% | 58.12% |
| Citrus | 116111 | 57468 | 57203 | 265 | 0.46% | 46.16% |
| Hernando | 128482 | 65500 | 65219 | 281 | 0.43% | 51.58% |
| Flagler | 49110 | 27194 | 27111 | 83 | 0.31% | 52.42% |
| Volusia | 425601 | 184153 | 183653 | 500 | 0.27% | 54.16% |
| Brevard | 470365 | 218989 | 218395 | 594 | 0.27% | 45.80% |
| Leon | 215926 | 103388 | 103124 | 264 | 0.26% | 61.13% |
| Seminole | 357390 | 137970 | 137634 | 336 | 0.24% | 43.88% |
| **Total** | **5614905** | **2353811** | **2320099** | **33712** | **1.43%** | **45.47%** |

1.  1999 Population Estimates, Population Estimates Program, Population Div., U.S. Census Bureau, <http://www.census.gov/population/estimates/county/co-99-1/99C1_12.txt>

2.  "Voter Turnout (November 15, 2000)," provided by the Sec. of State from Official Records in Response to Request of Court, November, 30, 2000.

3.  Id.

4.  Id.

5.  Id.

6.  "Gore Vote" Total Divided by "Total Bush/Gore Vote" for Each County, based on figures from Harris', Roberts', and Crawford's Response to Emergency Motion for Injunction Pending Appeal and to Expedite, Exhibit A; "2000 General Election Results, Unofficial (Recount Results 11/14/2000)," provided by Sec. of State from Official Records in Response to Request of Court, Nov. 30, 2000.